

**IT IS ORDERED as set forth below:**

**Date: September 5, 2025**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| In re:<br><br>THE ALIERA COMPANIES, INC.<br>d/b/a Aliera Healthcare, Inc., *et al.*,[1]<br><br>Debtors. | **Case No. 21-11548 (TMH)**<br>Currently pending in the U.S. Bankruptcy<br>Court for the District of Delaware |
| ALIERA LT, LLC, AS LIQUIDATING<br>TRUSTEE FOR THE ALIERA<br>COMPANIES, INC. D/B/A ALIERA<br>HEALTHCARE INC., ET AL. AND NEIL F.<br>LURIA, IN HIS CAPACITY AS THE<br>TRUSTEE OF THE SHARITY<br>MINISTRIES, INC., LIQUIDATING<br>TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | **Adversary Proceeding No**. 23-05215-<br>JRS |

---

[1] The jointly administered Debtors in these Chapter 11 cases along with the last four
digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No.
21-11548), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123),
Tactic Edge Solutions LLC (2923) (Case No. 22-10122) and USA Benefits & Administrators LLC (5803)
(Case No. 22-10121).

## <u>ORDER ON MOTION TO DISMISS</u>

The Plaintiffs here are trustees of liquidation trusts for the benefit of creditors established pursuant to confirmed Chapter 11 plans of liquidation in *In re The Aliera Companies, Inc., et al* (collectively, "Aliera") and *In re Sharity Ministries, Inc. f/k/a Trinity Healthshares, Inc.*[2] ("Sharity" or where more applicable, "Trinity").  They have filed an action against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") seeking to recover monies for the debtors' estates based on Defendant's alleged participation in a massive fraud scheme involving the sale of purported healthcare plans under the guise of a healthcare sharing ministry ("HCSM").  Defendant, a national banking association, allegedly played a critical role in the scheme by knowingly allowing Aliera and Trinity/Sharity to use bank accounts to carry out their fraudulent scheme and failing to report Aliera's unlawful activity related to these bank accounts.  This is one of five adversary proceedings filed by the Plaintiffs against banking institutions for their alleged participation in this scheme.

Plaintiffs consist of Aliera LT, LLC, as Liquidating Trustee under the Liquidation Trust Agreement (the "Aliera Trust Agreement") for Aliera (the "Aliera Trustee"), and Neil F. Luria, in his capacity as the Trustee of the Sharity Ministries, Inc. Liquidating Trust (the "Sharity Trustee", and collectively with the Aliera Trustee, the "Trustees"). In addition to the Aliera Trustee pursuing fraudulent transfer claims against Defendant, both Trustees are pursuing state law tort claims against Defendant for fraud, aiding and abetting fraud, conspiracy to commit fraud,

---

[2] *See In re Sharity Ministries, Inc.*, No. 21-11001 (Bankr. D. Del. July 8, 2021).

aiding and abetting breaches of fiduciary duty by the Aliera Insiders, civil conspiracy, negligence, gross negligence, attorney's fees and costs and punitive damages. The Sharity Trustee has also independently brought state law tort claims for Georgia RICO, conspiracy to violate Georgia RICO, and contribution.

Defendant has filed a Motion to Dismiss (the "Motion") each of the claims in the Amended Complaint for failure to state a claim. In addition, Defendant has moved to dismiss the state law tort claims for lack of standing and because of the equitable defense of *in pari delicto*.

The Court has reviewed the pleadings in the case and considered the oral argument and all other matters of record in the case.  As more fully discussed below, among other things, the Amended Complaint (a) does not plausibly allege that the fees and charges received by the Defendant were anything other than its customary fees and charges; (b) does plausibly allege that Aliera fraudulently induced Trinity into the parties' initial business agreement; (c) does plausibly allege that Defendant learned that Aliera did not fund Trinity despite those debtors having an agreement requiring Aliera to do so; but (d) does not plausibly allege that Defendant acted with malice and an intent to harm Aliera or Sharity or entered into an agreement or shared a common purpose with Aliera or Aliera's insiders to carry out fraud or any criminal conduct.

Based on that, and for the reasons set forth below, the Court will grant the Motion in part and dismiss all but the Sharity Trustee's fraud claim since the Trustees have otherwise failed to state a claim upon which relief can be granted

because: (1) the Aliera Trustee did not sufficiently plead lack of reasonably equivalent value and actual fraud with respect to the fraudulent transfer claims; (2) the Aliera Trustee failed to sufficiently plead a misrepresentation that was made to Aliera to support the Aliera Trustee's fraud claim; (3) the Trustees failed to sufficiently plead a mutual understanding or agreement to support their conspiracy claims; (4) the Trustees failed to sufficiently plead malice and intent to harm to support a claim for aiding and abetting a breach of fiduciary duty claim; (5) the Trustees failed to sufficiently plead a duty or damages to support a negligence claim; (6) the Sharity Trustee failed to sufficiently plead a racketeering activity, enterprise or conspiracy to support the Georgia RICO claim; and (7) the Sharity Trustee cannot have a claim for contribution because no underlying negligence claim was established and contribution does not apply to intentional tort claims.

## MOTION TO DISMISS STANDARD

When assessing a Rule 12(b)(6) motion, the Court assumes the truthfulness of "well-pleaded factual allegations" in the Amended Complaint "and then determines whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court construes those well-pleaded, plausible facts "in the light favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As such, the "plausibility standard" is less than a probability requirement, "but it asks for more than a sheer possibility that

4

a defendant has acted unlawfully." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

However, "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also* Fed. R. Bankr. P. 7009. Rule 9(b) exists to inform "defendants [of] the 'precise misconduct with which they are charged' and protect defendants against 'spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Mgmt. Assoc.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citation omitted). Still, this particularity requirement does "not abrogate the concept of notice pleading." *Id.* "Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." *Id.* at 1512. Before the Court are claims for fraud, aiding and abetting fraud, actual fraudulent transfer, and Georgia RICO based on insurance fraud. The circumstances of those alleged fraudulent acts will be assessed under the Rule 9(b) heightened pleading standard.[3]

---

[3] The Aliera Trustee's actual fraudulent transfer claim requires a showing that the debtor acted with "actual intent . . . to hinder, delay, or defraud a creditor of the debtor." O.C.G.A. § 18-2-74(a)(1). Because a plaintiff must prove the element of the transferor's fraudulent intent to succeed on an actual fraudulent transfer claim, and the transferee-defendant must know the particular circumstances of the fraud against which they are defending, the Court finds that application of Rule 9(b) is appropriate to Plaintiff's actual fraudulent transfer claim. *See, e.g., Kipperman v. Onex Corp.*, No. 1:05-CV-1242-JOF, 2007 WL 2872463, at *5–6 (N.D. Ga. Sept. 26, 2007) (applying Rule 9(b) to actual fraudulent transfers because it requires a showing of actual fraudulent intent); *In re Taylor, Bean & Whitaker Mortg. Corp.*, No. 3:09-BK-7047-JAF, 2012 WL 2369342, at *2 (Bankr. M.D. Fla. Mar. 22, 2012) (same); *Morris v. Zelch (In re Regional Diagnostics, LLC),* 372 B.R. 3, 17 (Bankr. N.D. Ohio 2007) (same). However, the Rule 9(b) heightened pleading standard does not apply to constructive fraudulent transfers. *See Kipperman*, 2007 WL 2872463, at *6; *In re Taylor, Bean & Whitaker Mortg. Corp.*, 2012 WL 2369342, at *3–4.

On a motion to dismiss for lack of standing, the Court "accept[s] as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "To satisfy its burden at the pleading stage, a plaintiff must 'clearly allege facts demonstrating each element [of standing.]'" *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)), including "'alleg[ing] specific, concrete facts demonstrating that the challenged practices harmed it.'" *Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga.*, 940 F.3d 1254, 1263–64 (11th Cir. 2019) (quoting *Warth*, 422 U.S. at 508) (emphasis in original).

The following recitation of allegations from the Amended Complaint are not findings of fact by the Court. In addition, the Court has also included facts that are matters of public record in the *Aliera* and *Sharity* cases to provide further context for its ruling on the Motion. The Court will now summarize the allegations in the Amended Complaint and public record for purposes of this Motion.

## BACKGROUND

### I. Allegations in the Amended Complaint

#### A. Background of Wells Fargo's Relationship with Aliera's Insiders

In 2004, Timothy Moses ("Moses") was charged with felony securities fraud and perjury for his role in operating a "pump and dump" scheme. He was subsequently convicted and sentenced to six-and-a-half years in prison, followed by five years of supervised release, as well as being ordered to pay $1.65 million in restitution.

Moses completed his sentence in April of 2015, and about one month later, he and his wife Shelley Steele ("Steele") formed HealthPass USA, LLC ("HealthPass"), a company that sold limited health care plans to small businesses. HealthPass was the predecessor to Aliera. Moses and Steele then opened a bank account for HealthPass with Wells Fargo. The Wells Fargo banker that opened the HealthPass account was Steele's sister, Judith, who had known of her brother-in-law's prior conviction.

### B. Aliera's Fraudulent Scheme

In December 2015, Moses and Steele formed Aliera Healthcare, Inc., a business created to sell health care plans to individuals, rather than just small businesses. Aliera was initially operated by Moses, Steele, and their son Chase Moses ("Chase" and collectively with Moses and Steele, the "Aliera Insiders"). As with HealthPass, the Aliera Insiders opened accounts at Wells Fargo in Aliera's name, including an account ending in number 0973, which the Aliera Insiders and Wells Fargo referred to as the "Mother Account."

Whereas HealthPass's business was modest, Aliera's business was robust. And while Wells Fargo was disinclined to provide more robust service offerings to HealthPass due to "risks inherent" in its business model, Wells Fargo took the opposite approach with Aliera. Wells Fargo's interest in Aliera increased as Aliera's business increased. This eventually led to Wells Fargo designating its employee, Paula G. Owens, as the "Principal Relationship Manager" to service Aliera. Ms. Owens frequently communicated and met with the Aliera Insiders. Shortly after one

of these meetings on May 25, 2016, Wells Fargo opened new accounts for Aliera.  At the same time, Wells Fargo increased the business services that it provided to Aliera and, correspondingly, the fees that it collected from Aliera.

Moses predicted explosive growth for Aliera, but when Ms. Owens requested audited financial statements from the business, he told her those were not available. Still, following Aliera's failure to provide these records, Wells Fargo continued to increase the services provided to and fees collected from Aliera.

By the second half of 2016, the Aliera Insiders realized they could profit from an exception to the Affordable Care Act ("ACA"). When Congress passed the ACA in 2010, the law included a "mandate" requiring all Americans to be covered by health insurance, subject to a host of consumer protections, or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One such exemption was for members of existing healthcare sharing ministries ("HCSMs").  To qualify as an HCSM, an entity must have continuously operated as a 501(c)(3) nonprofit organization since before the turn of the 21st century for the purpose of sharing monies to cover members' medical expenses. 26 U.S.C. § 5000A(d)(2)(B)(ii).[4]  The reason for the December 31, 1999, cutoff date was to ensure the reliability of care that comes with historical practice and to prevent "opening the flood gate" to groups seeking to circumvent the requirements of the ACA.

---

[4]  Additional requirements for an entity to qualify as an HCSM include that its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs" and "retain membership even after they develop a medical condition." *Id*.  The entity must also be subject to an annual audit by an independent CPA and make that audit available to the public upon request. *Id*.

*Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).  Many state insurance laws also provide a regulatory exemption for legitimate HCSMs.

Aliera itself was a for profit entity and therefore could not qualify as a legitimate HCSM.  To handle that problem, the Aliera Insiders recruited Anabaptist Healthshare ("Anabaptist"), a small Mennonite entity in Virginia, which had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services as an HCSM under 26 U.S.C. § 5000A.  In 2016, Moses convinced Anabaptist to create a new subsidiary, Unity Healthshare LLC ("Unity"), and allow Aliera to market HCSM products for the subsidiary.   Aliera and Anabaptist/Unity entered into an agreement.   Under that agreement, the Aliera Insiders, through Aliera, sold health care products that looked like health insurance, with comparable promised benefits, deductibles, co-pays, and lifetime limits, but at a price-point slightly lower than most ACA compliant insurance plans. Aliera was responsible for (1) creating and selling the plans to the public, (2) collecting the HCSM plan purchasers' (the "Consumer Members")[5] monthly payments, (3) maintaining and segregating the assets received that would ostensibly be reserved for Unity and for payment of benefits to Unity members, and (4) paying claims to Consumer Members or their health care providers.  Aliera began selling these plans to the public in November 2016.

---

[5] These Consumer Members are not to be confused with "members" of a limited liability company.

## C. *Defendant's Alleged Role in the Fraudulent Scheme*

Defendant provided banking services for Aliera Insiders' HCSM venture from Aliera's inception despite the Aliera Insiders failing to provide basic financial information to the bank and continued to provide banking services to Aliera and the Aliera Insiders as they expanded their HCSM business.  Not once did Ms. Owens receive an audited financial statement from Aliera.  Instead, through a series of emails sent between August and October of 2016, Ms. Owens asked for Steele's personal financial statement and her personal tax returns.

On November 2, 2016, Steele responded by:

(a) sending a personal financial statement, which claimed her interest in Aliera was worth $19.8 million, even though, by the end of 2016, the one-year-old company had posted only about $1.2 million in net annual income and had only about $850,000 in net equity;

(b) explaining that she had no real estate to report because she had sold her house, made no money on the sale, and was living with her mother;

(c) explaining that she had no personal tax returns to provide because "I had zero salary to report in 2015;" and

(d) touting, without providing evidence, the success of Aliera's future business: "Our growth pattern is straight up and exploding! So thrilled you guys are banking awesomeness!"

The same day, Steele asked for new accounts to be set up in Unity's name.  She explained, "we control a 'non-profit' group in Virginia."  She requested the Unity

accounts be separate from the "Aliera parent" so that member payments could be deposited directly into a Unity account, but that Aliera needed to be able to transfer funds between accounts.   In early December 2016, Wells Fargo's Ms. Owens requested a meeting to discuss the structure of the new Unity accounts.   Wells Fargo soon opened the accounts for nonprofit Unity, with Aliera's Moses, a felon convicted of financial crimes, as a signatory.   Despite opening the Unity accounts through Wells Fargo, payments from Consumer Members of Unity were never made into accounts in Unity's name.   Instead, those funds were all deposited into Aliera's Mother Account and comingled with the payments Aliera received for its other health plans.

Aliera's Insiders allegedly induced insurance agents to aggressively sell the plans by offering them exceptionally high commissions—30% or higher. The Aliera Insiders marketed the plans as a "faith-driven health care option" and represented that Consumer Members would submit their monthly "contributions into a cost sharing account with Unity Healthshare, LLC, acting as a neutral clearing house between [Consumer Members]," which would then "disperse monthly contributions" to reimburse Consumer Members' medical expenses.   As mentioned above, Aliera instead deposited Consumer Members' payments directly into the Mother Account and used the funds to pay brokers' commissions, its own payroll and expenses, and diverted millions of dollars to the Aliera Insiders.

Only a small percentage of the funds in the Mother Account was used to pay for medical claims.   Aliera contracted with a third-party administrator, which received the health care claims directly from members' medical providers. The third-

party administrator reviewed and adjudicated the claims, advising Aliera how much of each claim should be paid.  Aliera took a second look at the claims, and often reduced the amount recommended, especially if the claim was large.  Aliera then transferred funds from the Mother Account into a Wells Fargo zero balance account[6] in Unity's name.  The amount transferred was a small percentage of the amount deposited into the Mother Account from members. The third-party administrator then withdrew funds from the zero balance account to pay health care providers. Unity played no role in the payment of claims, despite Aliera's representations to the contrary.

Aliera was extremely successful in selling Unity's HCSM plans. As a result, deposits into the Wells Fargo Mother Account skyrocketed.  In June 2016, for example, approximately $24,000 was deposited into that account. Aliera had revenue of only about $2.3 million for the entire year of 2016. One year later, after Aliera's push to sell Unity plans, $2.5 million was deposited into that account in June 2017 alone.

Throughout 2016 and 2017, the Aliera Insiders did not provide any audited financial statements to Wells Fargo; nor were any available and continued to delay providing one whenever asked.  Aliera did, however, send Wells Fargo an *unaudited* internal balance sheet and a profit and loss statement on or about April 17, 2017, reflecting Aliera's income and assets for the first two months of 2017.  Those records

---

[6] For purposes of this Order, a "zero balance account" is a bank account wherein funds are transferred periodically out of and into linked accounts so that the "zero balance account" has a zero balance at the end of the period.

disclosed that, although Aliera claimed revenues of $2.4 million for those two months, it had only paid out approximately $12,000 in medical expenses for Consumer Members—just one-half-of-one percent of Aliera's revenues.  By way of example, the ACA requires traditional health insurers to allocate 80% of premiums towards payment of medical expenses.[7]

Wells Fargo knew that the Aliera Insiders' business model raised concerns. On June 1, 2017, Ms. Owens requested a meeting with the Aliera Insiders that would include her credit partner and treasury manager, and gave Steele a "heads up" about the topics of discussion.  Ms. Owens stated that Wells Fargo "need[ed] to get clarity around a few things," including (a) the connection between HealthPass and Aliera, (b) how profit is calculated for the funds that are premiums deposited into the Mother Account, (c) how Aliera determines that claims accounts have enough money in them to settle claims, (d) what the products are and how they are not insurance, (e) whether the products are regulated, and (f) how are the products paid for and what is the offset to revenue. Despite having these questions for the Aliera Insiders, Wells Fargo continued to service and create accounts for Aliera and the Aliera Insiders as Aliera's deposits continued to skyrocket.[8]

On June 14, 2017, just 13 days after Ms. Owens requested the meeting with the Aliera Insiders to go over questions and concerns that Wells Fargo had about

---

[7] 42 U.S.C. § 300gg-18(b)(1)(A). While HCSMs are not bound by the same rules as traditional health insurance, the Court cites to the ACA's rules as a useful comparison that emphasizes the disparity between what a traditional health insurer pay out to its policyholders and what Aliera allegedly paid to its Consumer Members.

[8] In June 2018, deposits into the Mother Account totaled more than $24 million—almost a ten-fold increase from June 2017.

Aliera's operations, Steele transferred $905,000 from the Mother Account to use as a down payment on a luxury home. She put title to that home in the name of Burdette Atlanta, LLC, an entity that she created and owned. On August 7, 2017, Steele wrote Owens asking for "a favor." She described her attempt to open an account at a Wells Fargo branch bank in the name of Burdette Atlanta, LLC, and objected to the bank branch's demand for a credit report, which Steele wanted to avoid. She told Owens, "I don't believe you guys have to [run a credit report], correct? . . . I have a zillion accounts" with Wells Fargo. She explained that Burdette Atlanta was set up to hold title to the Atlanta property that she had just purchased. Ms. Owens complied and opened the account.

Additionally, in July 2017, at Steele's request, Wells Fargo opened an account in the name of First Call Telemedicine, LLC ("First Call"), another entity owned by Steele, this one created to charge Aliera for telemedicine services. First Call itself provided no telemedicine services but contracted with a third party to provide the services, charging Aliera far more than it paid the third party. Shelley Steele pocketed the difference. In 2018, Steele transferred over $500,000 from the First Call account to herself and transferred another $75,000 to the Burdette Atlanta account.

On May 17, 2018, Steele, through her sister and a former Wells Fargo employee, asked Owens for a financial reference letter, to show to the Head of Insurance Supervision of the Cayman Islands Monetary Authority, in connection with an offshore captive insurance company the Aliera Insiders were creating. Despite still not having received audited financial statements after two years of

14

requests, Owens complied, this time effusing that Steele "has banked with Wells Fargo for several years. We have enjoyed a great relationship with the company and they have handled their accounts satisfactorily. We look forward to continuing this relationship for many years to come."

Also in 2018, at Steele's request, Wells Fargo opened accounts in the names of Reynolds Oconee LLC and JD Walton Newnan LLC. Like Burdette Atlanta, LLC, these entities were created and owned by Steele for the purpose of holding title to real property. Reynolds Oconee held title to lakefront property Steele purchased in April 2018, and JD Walton Newnan held title to a horse farm Steele purchased in June 2018. The June 2018 statement for the Mother Account reflects three transfers to Steele totaling $2,300,000, referenced as "Online Transfer to Steele S . . . Loan to Shareholder."

### D. Unity Discovers Aliera's Misuse of Funds, Advises Wells Fargo, and Terminates its Agreement with Aliera

In mid-2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist discovered that the Aliera Insiders had been commingling Unity member funds with funds belonging to other Aliera business units. It also discovered that Moses had misappropriated approximately $150,000 of Unity funds from a Unity account at Wells Fargo, for his own personal uses, and that Aliera had insufficient funds to cover members' claims. Unity requested an accounting and, in July 2018, demanded that the Aliera Insiders and Aliera turn over control of all Unity funds, but they refused to do so.

Between July 16 and July 20, 2018, on multiple occasions, Tyler Hochstetler,

chairman of Unity's board, communicated with Ms. Owens and others at Wells Fargo advising them of Moses's unauthorized withdrawals and the Aliera Insider's failure to segregate the Unity funds and insisting that Moses and Steele be removed as signatories on the Unity accounts.   Mr. Hochstetler emphasized that the Unity accounts had to be protected from the Aliera Insiders' dishonest practices and provided a corporate resolution that removed Aliera Insiders from the Unity account. However, rather than removing Moses and Steele as signatories, Wells Fargo agreed to freeze the Unity accounts on July 20, 2018.  That same day, an Aliera employee contacted Owens to ask how to void another check for $42,400 written to Moses from Unity's operating account.

Despite these clear warnings from Unity, Wells Fargo continued its support of the Aliera Insiders and their businesses.  On August 30, 2018, Paula Owens wrote to Steele referencing their meeting at Aliera's "wonderful" new offices the day before and inviting Steele to meet Wells Fargo's Division Manager over Business Banking, who "is fascinated by your company and would like to get to know the force behind Aliera."

Anabaptist/Unity terminated its relationship with Aliera in August 2018. Because of the termination, the Aliera Insiders could no longer sell new Unity plans, although it continued to receive funds from existing Unity members and deposited those funds into the Mother Account.  Aliera and Anabaptist/Unity sued each other in the Superior Court of Fulton County, Georgia in August 2018 (the "Fulton County Lawsuit").  The court in the Fulton County Lawsuit ruled that Aliera owed a fiduciary

16

duty to Unity which it had likely breached, that Aliera had demonstrated a lack of transparency with respect to the Unity HCSM plans and funds, that Aliera's course of conduct "evinces a threat of misappropriation of the plan assets," and that Aliera's failure to account for Unity funds supported the appointment of a receiver. A receiver was appointed and issued a report, finding that Aliera collected $297,903,437 in premium payments and enrollment fees from Unity plans between January 2017 and June 2019, all deposited into the Mother Account, where they were commingled with funds from other business.

### E. Defendant's Relationship with Trinity

When Aliera's relationship with Unity ended, the Aliera Insiders needed another HCSM through which they could continue to sell HCSM plans in order to keep the fraud going. Accordingly, the Aliera Insiders created Trinity Healthshares, Inc. as a Delaware nonprofit membership organization. As a membership nonprofit, Trinity's[9] mission and purpose was to benefit its Consumer Members. Consistent with state and federal law, Trinity's founding documents also included a prohibition on private inurement, stating that "[n]o part of the net earnings of the Corporation shall inure to the benefit of, or be distributed to its participants, directors, officers or other private persons." The Aliera Insiders caused this prohibition to be violated immediately.

From the beginning, Trinity was operated for, and its net earnings inured to, the benefit of the Aliera Insiders. Wells Fargo opened four accounts in Trinity's

---

[9] As a reminder, Trinity and Sharity are the same entity. Trinity changed its name to Sharity sometime in 2020. *See* (Am. Compl. ¶ 91, ECF No. 24).

name, but instead of opening accounts controlled by a Trinity employee, Steele and Chase were given control over the Trinity bank accounts.

Aliera claimed Trinity was an HCSM. That claim was false. Under the ACA, a qualifying HCSM must have been in existence and continuously sharing members' health care costs without interruption since at least December 31, 1999. But because Trinity was created in 2018 with no members and no history of health care cost sharing, it did not and could not qualify as an HCSM. When the Aliera Insiders created Trinity, it made William "Rip" Thead, III (Thead), an Aliera employee and a personal friend of the Moses family, CEO of Trinity. Thead had no experience running a nonprofit entity, or any business overseeing millions of dollars of assets. At its inception, Trinity had only two board members — Thead and his brother. The Aliera Insiders recruited Thead without letting him in on their true purpose in creating and controlling Aliera and Trinity.

On or about August 13, 2018, Aliera and Trinity entered into a lopsided "Management Agreement," in which Chase signed the 2018 Agreement on behalf of Aliera and Thead signing on behalf of Trinity.[10] The Management Agreement allowed the Aliera Insiders to continue the money-making scheme it had begun with Unity. Under the Management Agreement, just like under the agreement with Anabaptist/Unity, Aliera was to create, market, and sell health care plans purporting to be Trinity HCSM plans, collect all the money on behalf of Trinity, receive medical claims of the members, and, nominally, process claims for payment. Wells Fargo

---

[10] Thead did not have any representation to instruct him about the effect of the Management Agreement would have on Trinity.

allegedly agreed[11] to this structure where all Consumer Member payments were deposited into Aliera's Mother Account instead of going, even nominally, into a Trinity account.

The payment scheme under the Management Agreement provided that all monthly "contribution" payments would be made to Aliera, not Trinity. Aliera then allocated 30 to 40% of every payment to sales commission, and a separate, additional chunk to Aliera's fees. The result was that only about 16% of the funds collected for the Trinity plans were allocated to healthcare claims. This percentage was supposed to be placed into a Trinity "Sharebox" account to pay medical claims but ultimately was not. To make matters worse, the enrollment forms the Aliera Insiders created and required Trinity members to sign falsely represented that only 40% of their payments would be used for administrative expenses even though upwards of 84% was used for these so-called administrative expenses.

In order to stay afloat, the Aliera Insiders avoided, delayed, or unreasonably denied payment of claims to Consumer Members, as well as constantly signing up large numbers of new Consumer Members to replace Consumer Members who would inevitably depart once they realized their claims would not be paid as promised.

The Aliera Insiders created an additional entity, Ciel Capital Group, Inc. ("Ciel"), from which they could siphon cash from members' payments. Ciel was an entity nominally owned by Shelley Steele. Ciel claimed to provide advisory services

---

[11] Although the Amended Complaint alleges that Defendant "agreed" to this form of account structure, there are no specifics alleged as to how Defendant "agreed" or why its "agreement" was necessary to perform such a task.

by Moses to Aliera, although the account application provided to Wells Fargo gave no description of the business.  A few weeks after Wells Fargo opened that account in late 2018, the Aliera Insiders transferred $3,654,810 from the Aliera Mother Account to Ciel's account.  Over the following year, Moses used this account to siphon over $5 million from Trinity and Aliera, including paying his $1.65 million restitution judgment from his securities fraud and perjury conviction, loaning $975,000 to his son Chase, and making loans for a car dealership benefitting other family members.[12]

Of the four accounts that Wells Fargo opened in Trinity's name in September of 2018, and over which the Aliera Insiders had authority, one was created to be an account to pay claims.  Another was a "zero balance account," which was meant for Aliera's third-party administrator to debit to pay claims to health care providers.  By December 2018, Aliera had failed to deposit any funds into those accounts, and Wells Fargo even notified Aliera that it was closing those accounts because they had never been funded.  The Aliera Insiders reopened the accounts with a nominal deposit, but Aliera still did not transfer funds into those accounts until 2019.

Rather than funding the Trinity claims accounts, Aliera transferred money from its Mother Account elsewhere.  The Wells Fargo December 2018 account

---

[12] To recap, by the time Wells Fargo was asked to open the Trinity and Ciel accounts, (a) Aliera had not provided any audited financial statements to Wells Fargo, although they had promised to do so for at least two years; (b) Aliera's Insiders controlled nonprofit Unity for a year and a half, and all Unity funds were deposited in Aliera's Mother Account and commingled with other income; (c) Moses, Aliera's initial Executive Director, had written about $150,000 in unauthorized checks to himself from Unity's funds; (d) Aliera's unaudited balance sheet and profit and loss statements and projections showed minimal payments for Consumer Members' medical expenses; (e) Unity had insisted to Wells Fargo that the Aliera Insiders and personnel no longer have access to Unity's accounts because the Aliera Insiders engaged in fraud; (f) a receiver was appointed for Unity funds; and (g) the additional actions described above.

statement for the Mother Account provides an example.  At the beginning of the month, the account balance was approximately $27 million.  In addition, $20.9 million more was deposited into the account that month, and Aliera withdrew over $30 million.  Those withdrawals included $8 million for Aliera's estimated Federal and State tax payments; $6.6 million for commissions; $6 million to pay Unity claims;[13] $3.9 million to "Bill.com" to pay Aliera bills; $3.4 million for Aliera's payroll, including bonuses; $1,000,000 for an "Online Transfer Fund DAF Moses Family Charitable Fund"; $80,000 "Online Transfer to Steele S … Everyday Checking Bonus ADV." None of those withdrawals went to any Trinity account to pay the medical claims of Trinity's Consumer Members.  Moreover, on March 4, 2019, Steele emailed Ms. Owens and her assistant to give them a heads-up that there were three wires for $700,000, $750,000, and $950,000 that would be completed that day.  Those transfers were made to criminal defense attorneys representing Steele, Moses, and Chase.

### F. Aliera Insiders Restructure the Business to Appease Regulators

Just weeks after the Trinity HCSM plans began to be sold, regulators began to investigate the scheme.  In October 2018, the Insurance Commissioner of the State of Washington notified Aliera and Trinity that it was opening an investigation into the sale of their products.  That investigation resulted in a cease-and-desist order in May 2019 in the state of Washington.  The Washington Commissioner found that the

---

[13]  Due to the court- appointed receiver in charge of the Unity/Aliera plans as a result of the Fulton County Lawsuit, Aliera now had to ensure payment of Unity medical claims according to independent oversight.  Without a Unity reserve however, Aliera and the Aliera Insiders depended on the new money paid by the Trinity Members to pay the Unity claims.  At the same time, Trinity claims were substantially unpaid.

Trinity plans were insurance, that Trinity was not a legitimate HCSM exempt from insurance regulation, and that Aliera was illegally selling unauthorized insurance. The next month, in June 2019, the State of Texas, through its Attorney General at the request of that state's insurance commissioner, filed suit against Aliera, likewise claiming Aliera was engaged in the illegal sale of unauthorized insurance.  Soon, several other states[14] followed by taking action against Aliera, Trinity or both, in which the states generally concluded that the health care plans were illegal and unauthorized insurance products and that they were neither bona fide HCSMs nor exempt from insurance regulation.

In defending Aliera in these regulatory and legal actions, the Aliera Insiders asserted that Aliera was only a third-party administrator for Trinity.  To support this position, the Aliera Insiders insisted that Trinity obtain its own attorneys to represent it in the Washington Insurance Commissioner's action.   In mid-2019, Trinity also hired a President who had no prior connection to Aliera and recruited three independent board members.  By late 2019, Trinity had a structure that was independent of Aliera, but its ability to act independently was constrained by the Aliera Insiders' continued control of Trinity's assets and all of Trinity's cash in accounts with Wells Fargo.  Also, in response to these regulatory actions, the Aliera Insiders superficially distanced themselves from Trinity by creating four new Aliera subsidiary entities (the "Subsidiaries") and changed the name of Aliera from Aliera Healthcare, Inc. to The Aliera Companies, Inc, declaring Aliera a holding company.

---

[14] These states included California, Colorado, Connecticut, the District of Columbia, Iowa, Maryland, Michigan, New Hampshire, New Jersey, New Mexico, New York, Oregon, and Pennsylvania.

At the Aliera Insiders' request, Wells Fargo opened new bank accounts in each of the Subsidiaries' names.

The Aliera Insiders divided the various tasks Aliera was performing directly under the Management Agreement with Trinity among these four Subsidiaries. All four Subsidiaries had their principal places of business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of business. Trinity entered into new contracts, effective January 1, 2020, with each of the four Subsidiaries through which it was supposed to take control of deposits for Trinity accounts. But the money continued to flow into either the Mother Account or the new account set up in the name of Subsidiary USA Benefits.

Even after restructuring, Aliera continued to deduct outsized fees for itself or its Subsidiaries before underfunding Trinity accounts from which the member claims were to be paid. By the end of 2019, Aliera had a backlog of over $20 million in approved claims under the Trinity plans that were unpaid and no cash to pay them. The only way for Aliera to pay this mounting backlog of members' medical expenses, as members continued to submit claims, was to continue to bring in—and massively increase the number of—new Consumer Member payments. But regulators' cease and desist orders prohibited sales to new members in an increasing number of states, and membership precipitously declined throughout 2019 and 2020, as Consumer Members grew increasingly dissatisfied. Lawsuits and bad press contributed to the decrease in sales. During this time period, Wells Fargo never advised Trinity that its funds had been diverted to pay the Aliera Insiders and non-Trinity obligations.

### G. Defendant Terminates its Banking Relationship with Aliera and Trinity, and Aliera Insiders' Scheme Implodes

By June 2019, Wells Fargo had finally become concerned, as publicity increased about actions taken by the State of Texas against Aliera and about the Fulton County Lawsuit between Unity and Aliera. Still, Wells Fargo continued to provide banking services to Aliera and Trinity, including opening new accounts for the Subsidiaries, while the Aliera Insiders continued to aggressively sell the Trinity plans to new Consumer Members to fund the scheme.

However, by the end of 2019, Wells Fargo decided that it could no longer support Aliera and Trinity. On or about November 25, 2019, the bank notified both Trinity and Aliera that it was terminating their accounts in sixty days. The accounts were eventually closed in March 2020 after Wells Fargo granted a sixty-day extension.

## II. Aliera and Sharity's Bankruptcy Cases

### A. Sharity's Bankruptcy and Aliera's Winddown[15]

Over the following year, Trinity, by this time called Sharity, attempted to divorce itself from the Aliera Insiders and Aliera, but the Aliera Insiders' control over Sharity's funds and bank accounts, all established through Wells Fargo, was a roadblock to independence. When Sharity finally wrestled control of its bank

---

[15] The Court takes judicial notice of matters of public record in the respective bankruptcy cases for Aliera and Sharity. Docketed items from *In re Sharity Ministries, Inc.*, No. 21-11001 (Bankr. D. Del. July 8, 2021) will be hereinafter cited to by their "Sharity Docket" number. Docketed items from *In re The Aliera Companies, Inc.*, No. 21-11548 (Bankr. D. Del. Dec. 3, 2021) will be hereinafter cited to by their "Aliera Docket" number.

accounts and funds in Spring 2021, its board soon voted to file for bankruptcy. Sharity's voluntary petition under Chapter 11 was filed on July 8, 2021.

Although it originally intended to reject the Aliera Subsidiary contracts and restructure through new partners at far lower rates, Sharity discovered the backlog of claims had grown to over $50 million, while it held less than $750,000 in its Sharebox account to pay them. Sharity quickly realized that restructuring was not feasible and voted to liquidate instead.

Once Sharity filed for bankruptcy and Aliera no longer had the revenue from the Sharity plans, the Aliera Insiders attempted to put Aliera out of business quietly, through an assignment for the benefit of creditors process in Georgia. But judgments in two class actions brought by and on behalf of Sharity members intervened—a judgment for $20,646,077.08 on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al.*, No. 2:19-cv-01281, in the Western District of Washington, and a judgment for $4,679,868.46 on November 17, 2021, in *Albina, et al. v. The Aliera Companies, Inc., et al*., No. 5:20-CV-00496, in the Eastern District of Kentucky. In addition, on November 24, 2021, the Sharity Official Committee of Unsecured Creditors filed an adversary proceeding against Aliera, among others, in the Delaware Court for conversion and unjust enrichment, as well as to avoid and recover fraudulent and preferential transfers, seeking damages in the amount of $574,736,117. Complaint, *Off. Comm. of Members of Sharity Ministries, Inc. v. The Aliera Companies, Inc. (In re Sharity Ministries, Inc.)*, Ch. 11 Case No. 21-11001, Adv. No. 21-51291 (Bankr. D. Del. Nov. 24, 2021), ECF No. 1 (the "Sharity Adversary").

The Sharity Adversary was stayed when the Aliera Bankruptcy Cases were filed in December 2021.

On November 29, 2021, pursuant to the Plan of Liquidation confirmed by the Delaware Court [Sharity Docket No. 343] in Sharity's bankruptcy case (the "Sharity Plan"), a Liquidating Trust (the "Sharity Trust") was established. [Sharity Docket No. 315]. The Sharity Trust is managed by the Sharity Trustee in accordance with the Liquidating Trust Agreement (the "Sharity Trust Agreement"), and it is overseen by a Liquidating Trust Committee composed of no more than five (5) Consumer Members. [Sharity Docket No. 315-1]. The Sharity Trustee was appointed by the Consumer Members Committee[16] with input from Governmental Units holding Allowed Governmental Fines and Penalty Claims and ratified by the Delaware Court at the confirmation hearing. [Sharity Docket No. 315-1].

Pursuant to the Sharity Plan, all claims and causes of action of both Sharity and its bankruptcy estate vested in the Sharity Trust so that the Sharity Trustee has standing to prosecute those causes of action for the sole benefit of creditors. With respect to the causes of action which are vested in the Sharity Trust, the Sharity Plan and the Sharity Trust Agreement provide that the Sharity Trustee is a fiduciary for the beneficiaries of the Sharity Trust, which are the creditors with allowed claims, thereby excluding Aliera and Sharity itself as beneficiaries. The percentage of the unsecured class of pre-petition Consumer Members and general unsecured creditors that voted in favor of Sharity Plan was 98.16%. [Sharity Docket No. 312].  The total

---

[16] "Consumer Member Committee" here means the Official Committee of Members appointed by the U.S. Trustee in the Sharity Chapter 11 Case on August 20, 2021 [Sharity Docket Nos. 163, 315-1].

claims of those creditors in the Sharity case are estimated to be in excess of $300 million. [Sharity Docket No. 343-1].

### B. Aliera's Bankruptcy

Judgment creditors—all Sharity Consumer Members—filed an involuntary petition against Aliera in the Delaware Bankruptcy Court, after which Aliera and its Subsidiaries filed their own petitions in this bankruptcy court in Georgia.   The Georgia cases were transferred to Delaware and consolidated with the pending involuntary action, and the Delaware court entered an Order for Relief on February 16, 2022.

On August 17, 2023, an order entered by the Delaware Court [Aliera Docket No. 576] (the "Confirmation Order") confirmed the *Modified First Amended Plan of Liquidation* (the "Aliera Plan"), which approved the Aliera Trust Agreement and the selection of the Aliera Trustee according to the Aliera Trust Agreement. Pursuant to the Aliera Plan and the Aliera Trust Agreement, all causes of action held by Aliera and its bankruptcy estate were vested in the Aliera Trust, and the Aliera Trustee has "sole and exclusive authority and standing to commence and prosecute" claims of Aliera and its bankruptcy estate for the sole benefit of Aliera's creditors with allowed claims. [Aliera Docket No. 576-1]. With respect to the causes of action that vested in the Aliera Trust, the Aliera Plan and Aliera Trust Agreement provide that the Aliera Trustee is a fiduciary only to the beneficiaries of the Aliera Trust Agreement, which are the creditors with allowed claims, and which excludes the Aliera Insiders and Aliera itself as beneficiaries. [Aliera Docket No. 576]. A committee comprised of no

more than two designees from Aliera's Official Committee of Unsecured Creditors and the Sharity Liquidating Trust, respectively, provides oversight of the Aliera Trustee. [Aliera Docket No. 576]. The percentage of unsecured classes that voted in favor of Aliera Plan was in excess of 93%. [Aliera Docket No. 557-1].

As part of the Aliera Plan, a settlement of the Sharity Adversary was approved, which provided that the Sharity Trustee would have an allowed Class 4 unsecured claim against Aliera of $362,764,161.[17] The Unity Member Claims were also allowed as a Class 4 unsecured claim in the amount of $297,903,437. Other non-insider Class 3 unsecured claims are estimated to be between $10,000,000 to $15,000,000 and Class 5 claims of governmental entities for fines and penalties were estimated at $225,000,000.

## DISCUSSION

## I. Standing & In Pari Delicto

In the Motion, Defendant argues that the Trustees' state law tort claims must be dismissed because of lack of standing and the equitable defense of *in pari delicto*. The first issue the Court shall deal with is standing.   This is an Article III constitutional issue that limits federal court jurisdiction to only those matters where the plaintiff "demonstrate[s] [1] that he has suffered 'injury in fact,' [2] that the injury is "fairly traceable" to the actions of the defendant, and [3] that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear,* 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  On the other

---

[17] This settlement resolved Sharity Adversary and also resulted in the disallowance of any claims Aliera had asserted against Sharity.

hand, *in pari delicto* is an equitable defense that prevents a plaintiff from recovering from a defendant where the plaintiff and defendant are at equal fault for the alleged wrongdoing. *See, e.g.*, *Hays v. Paul, Hastings, Janofsky & Walker LLP*, No. 1:06-CV-754-CAP, 2006 WL 4448809, at *10 (N.D. Ga. Sept. 14, 2006). Because one is a federal jurisdictional issue and the other is an equitable defense to liability, these issues deserve separate analyses. *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149 (11th Cir. 2006) ("[A]n analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*.").

The Court has dealt with these two issues at length in *Aliera LT, LLC v. Health Reform Team, Inc. (In re Aliera Cos., Inc.)*, 665 B.R. 468, 491–511 (Bankr. N.D. Ga. 2024). This Court's standing analysis from *Health Reform Team* has since been expressly adopted by the Honorable Victoria Marie Calvert in *SEC v. Drive Planning, LLC*, No. 1:24-CV-03583-VMC, 2025 WL 1827684, at *6–7 (N.D. Ga. July 2, 2025). Because the law on standing and *in pari delicto* has not significantly changed from this Court's analysis in *Health Reform Team*, the Court incorporates, in relevant part, the law on these two issues below, beginning with the jurisdictional issue of standing.

### A. Standing

#### 1. Rights and Powers Generally of a Trustee or Creditor Representative of a Ponzi-type Debtor

The argument that the Trustees do not have standing to bring the Georgia state law claims asserted here is primarily based on several Eleventh Circuit cases that concluded receivers lacked standing to bring Florida common law tort claims on behalf of a Ponzi corporation because the receivership estate was "'a sham corporation

created as the centerpiece of a Ponzi scheme,' [and] the corporate entity could not have suffered any injury from its own fraudulent scheme." *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1315 (11th Cir. 2024) (emphasis omitted) (quoting *Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 903 (11th Cir. 2022)); *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296 (11th Cir. 2020). Defendant analogizes receivers outside of bankruptcy to a liquidating trustee appointed pursuant to a bankruptcy plan and argues that neither the Aliera nor Sharity Trustee has standing because both debtor entities allegedly participated in the fraudulent money-making scheme.

However, with respect to a RICO claim brought under federal law, the Eleventh Circuit affirmed the analysis of the district court that found that a bankruptcy trustee "had standing based on an alleged injury to the debtor estate," despite the debtor purportedly being an "active participant" in the torts at issue in the case, because a trustee represents the bankruptcy estate and has the right to bring any causes of action that the debtor "could have brought outside of bankruptcy." *Edwards*, 437 F.3d at 1149–50, 1155.

After *Edwards*, the issue of standing in this context does not reappear in a published opinion by the Eleventh Circuit until almost 14 years later in *Isaiah*, 960 F.3d 1296. In *Isaiah*, a receiver of a Ponzi debtor brought two Florida common law tort claims against a bank into which funds were deposited for allegedly willfully ignoring suspicious activity and aiding and abetting the Ponzi scheme. *Id*. The Eleventh Circuit concluded that the receiver did not have standing to bring such claims because the Ponzi torts were imputed to the receiver in situations where the

30

corporation in receivership did not have "at least one honest member of the board of directors or an innocent stockholder," *Id.* at 1306 (citing *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 550 (Fla. Dist. Ct. App. 2003)).[18]  *Isaiah* made frequent comparisons of its fact pattern to *Freeman*[19]—a Florida state appellate case interpreting Florida law—and eventually concluded that "[the receiver's] ability to pursue these claims is barred . . . by the fact that the Receivership Entities were controlled exclusively by persons engaging in and benefitting from the Ponzi scheme." *Isaiah*, 960 F.3d at 1306 (citing *Freeman*, 865 So. 2d at 550–51).  Therefore, even though the receiver was barred from bringing Florida common law tort claims under the facts of that case, the Eleventh Circuit recognized that these limitations arose under Florida's receivership law.

Two years later in *Perlman v. PNC Bank*, the Eleventh Circuit addressed whether a Florida statute that defined a receiver as having the right and power "to bring actions in the name of and on behalf of the defendant enterprise, without regard to any wrongful acts that were committed by the enterprise" overcame *Isaiah*'s holding on standing.  38 F.4th at 901, 904–05 (quoting Fla. Stat. § 501.207(3)).  Interpreting this Florida statute, *Perlman* found that because the statute failed to

---

[18]  A footnote in *Isaiah* explained that in *O'Halloran v. First Union Nat'l Bank of Fla.*, the Eleventh Circuit "agreed with the trustee that he lacked standing to bring claims against the [third party] related to the Ponzi scheme." *Isaiah*, 960 F.3d at 1306 n.8 (citing *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197 (11th Cir. 2003)).  Nevertheless, *O'Halloran*'s dicta, which predates *Edwards,* does not resolve the issue of standing in the case before this Court because it was not actually raised or otherwise litigated in *O'Halloran*, nor did *O'Halloran* deal with the issue of standing of a trustee with respect to Georgia state common law torts claims.  Even the concurring opinion in *Wiand* referred to this portion of *O'Halloran* as dicta.  *Wiand*, 96 F.4th at 1314.

[19]  *See Isaiah*, 960 F.3d at 1307–08 ("This case is indistinguishable from *Freeman*. . . . As in *Freeman*, any claims for aiding and abetting the torts of the Receivership Entities' corporate insiders belong to the investors who suffered losses from this Ponzi scheme, not the Receivership Entities.").

31

"address the relationship between a corporation's insiders and the corporation itself," the statute failed to overcome the mandate in *Isaiah* that the plaintiff allege at least one "innocent director or shareholder."  *Id*. at 905.  Notably, *Perlman* affirmed that *Isaiah* was decided by "[a]pplying Florida law" principles, and the decision suggested that Florida's receivership statutes or cases interpreting them could have changed the outcome in the standing analysis.  *See id*. at 905.[20]

Most recently, the Eleventh Circuit decided *Wiand v. ATC Brokers Ltd*., by applying the principles established in *Isaiah* and *Perlman* to yet another Ponzi entity put into a receivership in Florida.  96 F.4th at 1310–11.  While a receiver of a Ponzi entity must allege that there was an innocent director or shareholder, *Wiand* held that these innocent individuals must have had control over the Ponzi corporation sufficient to "exercise[] any decision-making power" over the corporation's affairs in order for that receiver to have standing.  *Id*. at 1311.

In his concurring opinion in *Wiand*, the Honorable Stanley Marcus emphasized the state-specific nature of this issue:

> [T]he better way to understand the defect in Wiand's tort claims is the receiver does not have a cause of action under Florida's common law of tort to sue on behalf of Ponzi corporations.  *Id* at 1312. … [T]he problem with a receiver bringing common-law tort claims on behalf of a Ponzi corporation in Florida is not that a court lacks the power to adjudicate the claims, but that it chooses not to recognize them.  The receiver is without a cause of action precisely because the Florida courts have so ruled, not because the receiver lacks Article III standing, which is a different question the federal courts must answer.

*Id*. at 1316.

---

[20] "Perlman does not cite to any cases interpreting Section 501.207(3), so we are limited to the plain language of the statute [in effectuating the standing analysis]."  *Id*.

Judge Marcus further noted that "courts over the years have used jurisdictional terms in a loose fashion [and] have sometimes mischaracterized claims-processing rules or elements of a cause of action as jurisdictional limitations." *Id.* "The rule in *Isaiah* is the type of mistaken jurisdictional holding the Supreme Court has eschewed." *Id.* at 1314.

Judge Marcus's opinion may be a concurring opinion, but it is different than most: it is actually joined in by the entire panel, including the author of the majority opinion, Chief Judge William Pryor, the author of *Edwards*, wherein the Eleventh Circuit held that a bankruptcy trustee had standing to sue for injuries to a debtor estate of a Ponzi entity.

What *Isaiah*, *Perlman*, and *Wiand* all share in common is that they not only involve a receiver of a Ponzi debtor asserting Florida common law tort claims, but that the Eleventh Circuit ultimately resolved the standing issue by application of Florida law. The instant case before this Court, however, involves liquidating trustees of liquidating trusts pursuant to 11 U.S.C. § 1123 and claims arising under Georgia law—not Florida law. As the Court will demonstrate, neither the Bankruptcy Code nor Georgia law preclude a trustee from having standing to bring a claim for injury to the debtor even if the debtor was involved in wrongdoing.

To summarize the main point: in addition to actions arising under the Bankruptcy Code, such as avoidance actions, the Trustees have standing to prosecute a claim for an injury the debtor held at the time of the bankruptcy filing under applicable federal or state law. And so, because neither bankruptcy law nor Georgia

law prohibit a Ponzi-type debtor from bringing a Georgia state law tort claim based on conduct related to that scheme, and the Eleventh Circuit found the trustee had standing to pursue such a claim in *Edwards*, the Court finds that the Trustees here generally have standing to bring an action based on conduct related to the alleged HCSM scheme. The Court will now address the types of claims the Trustees may prosecute.

### 2.  Determining Whose Claim the Trustees Can Prosecute

Georgia district and bankruptcy courts, as well as the Eleventh Circuit, have found a bankruptcy trustee generally does not have standing to bring a claim based on harm to the estate's creditors instead of the debtor. *See, e.g., E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 985–87 (11th Cir. 1990) (finding that the trustee did not have standing where he "admittedly . . . assert[ed] claims of a *specific group* of [the debtor's] customer creditors." (emphasis added)); *Gordon v. Harman (In re Harman)*, 520 B.R. 906, 909–12 (Bankr. N.D. Ga. 2014) (holding that the trustee did not have standing to bring a claim where the trustee "allege[d] an injury to Debtor's creditors, rather than to Debtor."); *Post-Confirmation Comm. for Small Loans, Inc. v. Martin*, No. 1:13-CV-195-WLS, 2016 WL 632482, at *4 (M.D. Ga. Feb. 17, 2016) (finding that under federal law, there was no standing to pursue claims in which the trustee alleged that "Investors and other creditors of the Debtors were damaged" rather than the debtors themselves being injured. (emphasis omitted)). In such cases, "[t]he distinguishing element between general and personal claims is whether the type of injury is 'general and common' to debtors and creditors alike or whether the injury is

'peculiar and personal' to the creditor itself." *Post-Confirmation Comm. for Small Loans, Inc.*, 2016 WL 632482, at *4 (citation omitted).

As the Court will discuss in more detail below, general claims of Aliera and Sharity's creditors and certain state law tort claims brought by the Trustee's as alleged in the Amended Complaint are able to be pursued by the Trustees. Others may not be.

In *Baillie Lumber Co. v. Thompson (In re Icarus Holding, LLC)*, the Eleventh Circuit held that a bankruptcy trustee may sue a defendant on the basis of the general claims all creditors may have against a third party, as long as the claim is allowed by state law, as opposed to claims that are particular to a specific creditor. 391 F.3d 1315, 1319–21 (11th Cir. 2004) (holding that in order for an alter ego action to be property of the bankruptcy estate, the "trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law."). A "claim is a general one when liability extends to all creditors of the corporation without regard to the personal dealings between such officers and such creditors." *Id.* at 1321 (internal quotations and citation omitted). One example of a general claim is where a defendant "loot[ed]' the corporate assets[,] . . . [because] [b]y misappropriating

corporate assets, [a defendant] cause[s] direct harm to the corporation and only indirect harm to [the creditors]." *Id.*[21]

In addition, the Court finds that the mere fact both the debtors and creditors may hold claims against Defendant based on related or overlapping conduct, albeit different causes of action, would not interfere with the policy concerns raised in *Harman*. As the Honorable Joyce Bihary noted in *In re Plaza Mortg. & Fin. Corp.*,

> If the trustee and the creditors have different claims, and if the trustee recovers and makes a distribution to creditors, this does not deprive the creditors of standing to bring their claims. It only reduces their damage claim to the extent they have received a distribution from the estate.

187 B.R. 37, 41 (Bankr. N.D. Ga. 1995).

Thus, if a creditor of Aliera or Sharity wished to bring a claim against Defendant in a separate suit that was not subject to the automatic stay because it

---

[21]   Property of the estate includes "all legal and equitable interests of the debtor as of the commencement of the bankruptcy case." 11 U.S.C. § 541.  *Icarus Holding* stands for the proposition that where a debtor suffers direct harm from the wrongdoing of another party that indirectly harms the debtor's creditors as a whole, the debtor has a general claim that it (or a trustee representing the estate) can pursue against the wrongdoer, provided that state law permits such a claim.  *See In re Icarus Holding, LLC*, 391 F.3d at 1319–21.

One case that was argued as applying to the present proceeding was *Flatau v. Stewart (In re Stewart)*, 339 B.R. 524 (M.D. Ga. 2006).  In that case, the court held that a RICO claim brought by an individual creditor was not stayed because under the doctrine of *in pari delicto* that claim was not property of the estate.  The doctrines of standing and the *in pari delicto* defense are often confused and, in fact, different concepts that warrant separate analyses.  *See Edwards*, 437 F.3d at 1149 ("'[A]n analysis of standing does not include an analysis of the equitable defenses, such as *in pari delicto*.'" (citation omitted)).  For this reason, the Court is not persuaded by *Stewart*.  In the Eleventh Circuit, regardless of the applicability of the *in pari delicto* defense, a general claim for damages applicable to all creditors is property of the estate for which a debtor or its representative in bankruptcy has standing to bring.  *See In re Icarus Holding LLC* 391 F.3d 1319 (holding that an alter ego action may be pursued by a bankruptcy trustee where it is a general claim applicable to all creditors and allowed by state law); *Bond Safeguard Ins. Co. v. Wells Fargo Bank, N.A.*, 502 Fed. Appx. 867, 869 (11th Cir. 2012) ("A general claim that 'applies equally to all creditors' and can be brought by the debtor is the property of the bankruptcy estate of the debtor." (quoting *In re Icarus Holding, LLC*, 391 F.3d at 1319–20)).  Thus, whether a claim is property of the estate is applicable in a standing analysis but not an *in pari delicto* analysis, which is an equitable, affirmative defense to a cause of action rather than a defense to whether a particular claim is property of the estate.

was a general claim, they could do so; the only caveat would be that any recovery would be adjusted to prevent them from "double-dipping." *See id.* Judge Bihary's approach makes sense. "The concept of a trustee in bankruptcy is that of a creditor representative whose single effort will replace that of multiple and often wasteful and competitive efforts of individual creditors." *Id.* at 42. Therefore, "[t]o find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors is an absurd argument" because at the end of the day, "the trustee's goal is to make a distribution to creditors." *Id.*

When pleading a general claim, whereby the creditors as a whole were harmed, the trustee must still plead an injury unique to the debtor estate as a result of the alleged misconduct. *Id.* at 43–45. For example, such injury could be the misappropriation of funds from the debtor. *Id.* at 43 ("It is the removal of assets that damaged the debtor, and the trustee has standing to sue for this type of injury."). Thus, a "trustee should be careful not to plead a recovery based on any injury to the

investors/creditors, even [if] the fraud on the [creditors] will be a part of the background allegations." *Id.* at 44.[22]

It is also important to note that "when the officer or agent departs from the scope of his duties and acts in such a way that his private interest outweighs his obligation as a corporate representative, the law will not impute his knowledge to the corporation." *Clarence L. Martin, P.C. v. Chatham Cnty. Tax Com'r*, 574 S.E.2d 407, 409 (Ga. Ct. App. 2002). It therefore follows that a corporation can be harmed by actions taken by its Aliera Insiders in that personal capacity, along with any accomplices, co-conspirators, or similar parties to the tortious conduct. *See id.*

---

[22] In a footnote, the Sharity Trustee argues that because Sharity was a nonprofit membership organization, he can pursue claims for direct injuries suffered by its Consumer Members. *See* (Response to Motion at 12 n.7, ECF No. 24). However, that argument is incorrect as applied to the allegations in this case. The first barrier to so-called organizational standing is for the plaintiff to be "a genuine membership organization in substance." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 200 (2023); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).

For purposes of organizational standing, the members must have "the opportunity to have input and direction" on the organization's mission. *Students for Fair Admissions*, 600 U.S. at 201. For example, in *Hunt*, an advertising commission was found to have "possess[ed] all of the indicia of membership" when its members "alone" (1) elected the organization's officers, (2) served as officers of the organization, and (3) financed the organization's activities. 432 U.S. at 344–45; *Students for Fair Admissions*, 600 U.S. at 200.

However, as alleged, Sharity does not fit that description. The Amended Complaint does not indicate that Sharity's Consumer Members had the ability to elect or serve as its officers, nor did these Consumer Members allegedly have any ability to provide input and direction regarding Sharity's mission, goals, or business. The Consumer Members did not steer the ship and were more akin to customers of Sharity. *See also Fleck & Assocs., Inc. v. Phoenix, City of, an Arizona Mun. Corp.*, 471 F.3d 1100, 1106 (9th Cir. 2006) (holding that a corporation did not have organizational standing where its "members" were "merely customers."); *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000) (holding that organizational standing does not arise from a "business-consumer relationship."). The Court therefore rejects the Sharity Trustee's organizational standing argument.

As discussed above, a trustee in bankruptcy cannot bring claims on behalf of a specific class of creditor; the claims must have arisen from either direct injury to the debtor or an indirect, general injury to all creditors of the debtor. Thus, the Sharity Trustee does not have standing to bring claims for direct injuries to Consumer Members as a specific class of creditor.

The Court now turns to the issue of whether the Trustees have standing for each of the Georgia tort claims in the Amended Complaint before addressing whether the claims are barred by the *in pari delicto* defense and finally whether the Trustees have stated claims upon which relief can be granted.

### 3. The Standing of Our Two Plaintiffs to Bring These Georgia State Law Claims

As discussed, standing is a constitutional requirement that requires a plaintiff to "demonstrate [1] that he has suffered 'injury in fact,' [2] that the injury is 'fairly traceable' to the actions of the defendant, and [3] that the injury will likely be redressed by a favorable decision." *Bennett*, 520 U.S. at 162 (quoting *Lujan*, 504 U.S. at 560–561). The first element of standing, injury-in-fact, requires the plaintiff to have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Next, that injury must be "fairly traceable" to the defendant's conduct. "Fairly traceable" is a lower causation standard than proximate cause—even "harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

### a. The Trustees' respective standing to pursue the aiding and abetting Aliera Insiders' breach of fiduciary duty and civil conspiracy claim

### i. The Aliera Trustee's claims

In its Amended Complaint, the Aliera Trustee pleads counts for aiding and abetting breach of fiduciary duty and civil conspiracy, alleging that Defendant assisted the Aliera Insiders in breaching their fiduciary duties to Aliera. The Aliera Trustee has pleaded an injury to Aliera as a result of the conduct related to these claims. The Aliera Trustee has also alleged that Aliera's creditors were owed fiduciary duties by the Aliera Insiders because Aliera was insolvent at the time of the tort. This begs the question: is this cause of action held by Aliera or Aliera's creditors? As the Court will explain, the claim is held by Aliera.

To determine whether the Aliera Trustee can maintain this cause of action, the Court must apply the test as set forth in *Icarus Holding* to determine whether the action this claim is based on caused general harm to all of Aliera's creditors and whether state law allows it. First, the Court finds that this is a general claim because it is predicated on the alleged misappropriation of corporate assets by the Aliera Insiders with the assistance of Defendant, which resulted in all of Aliera's creditors being harmed equally because it left Aliera unable to pay its debts as they came due. Thus, the general claim element has been established.

Next, the Court must determine whether Aliera could have brought these claims under Georgia law. To bring a claim for aiding and abetting breach of fiduciary duty, the defendant must have, *inter alia*, "acted to procure a breach of *the primary*

40

*wrongdoer's fiduciary duty to the plaintiff*." *Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006) (emphasis added). Additionally, an action for civil conspiracy requires proof of the "underlying tort," which in this case is aiding and abetting a breach of fiduciary duty. *Jenkins v. Wachovia Bank, Nat. Ass'n*, 711 S.E.2d 80, 85 (Ga. Ct. App. 2011). Here, the Aliera Trustee alleged that Defendant aided and abetted Aliera's Insiders, the purported "primary wrongdoers," in breaching their fiduciary duties owed to both Aliera and Aliera's creditors.

As previously discussed, the Aliera Trustee does not have standing to assert particular claims held by Aliera's creditors, but the Aliera Trustee does plead direct financial injury to Aliera itself.  The next question is whether the Aliera Insiders owed a fiduciary duty to Aliera, instead of the creditors, despite Aliera allegedly being insolvent since its inception.

Georgia law "does not authorize [the State] to regulate the organization or internal affairs of a foreign corporation authorized to transact business in" Georgia. O.C.G.A. § 14-2-1505(c). Because Aliera was a Delaware corporation, the Court must look to Delaware law governing the fiduciary duties of corporate directors and officers of an insolvent corporation. Applying Delaware's law for corporate fiduciary duties, "[t]he directors of an insolvent firm . . . owe fiduciary duties [directly] *to the corporation* for the benefit of all of its residual claimants." *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 546–47 (Del. Ch. 2015) (emphasis added) (explaining the Delaware Supreme Court's decision in *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101, 103 (Del. 2007), which held that "the

41

creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties," but "have no right to assert direct claims for breach of fiduciary duty against corporate directors.").

So, what does this mean for the instant case? Because Georgia law requires the Court to apply the law of Aliera's state of incorporation—Delaware—Aliera's Insiders continued to owe a fiduciary duty to Aliera itself while Aliera was insolvent. Aliera's creditors, by contrast, were never directly owed fiduciary duties by the Aliera Insiders—the primary wrongdoers alleged as part of this claim. Their standing would have been limited to a derivative suit brought on behalf of Aliera. Thus, the Aliera Trustee is the exclusive holder of claims based on the Aliera Insiders' breaches of fiduciary duties to Aliera.  As such, the Aliera Trustee has standing to prosecute claims for aiding and abetting breach of fiduciary duty and civil conspiracy.[23]

Based on the foregoing, the Court finds that the Aliera Trustee has sufficiently pleaded a financial injury to Aliera based on the Aliera Insiders' looting of its corporate bank accounts.  That financial injury is fairly traceable to Defendant's conduct of opening and maintaining bank accounts for Aliera and the Aliera Insiders, which were allegedly used by Aliera's Insiders to effectuate transfers to themselves and other entities they owned and controlled from the Mother Account. Finally, the alleged financial injury may be redressed by money damages.  Therefore, the Aliera

---

[23]  The Court notes that the resolution of this claim does not require the Court to delve into the "general" and "personal" claim distinction, because this claim is not, nor could be, held by any creditor of Aliera barring an assignment of such claim. Instead, this is a claim held uniquely by the Aliera Liquidation Trust as the assignee of all claims of the Aliera estate.

Trustee has standing to pursue its claims for aiding and abetting breach of fiduciary duty and civil conspiracy based on the same underlying tort.

### ii. The Sharity Trustee's claims

Unlike the Aliera Trustee, the Sharity Trustee does not have standing to pursue its claims for aiding and abetting breach of the Aliera Insiders' fiduciary duty and civil conspiracy.  Insolvency "'marks a shift in Delaware law,' but 'that shift does not refer to an actual shift of duties to creditors . . . .  Instead, the shift refers primarily to standing: upon a corporation's insolvency, its creditors gain standing to bring *derivative actions* for breach of fiduciary duty." *Quadrant Structured Prods. Co.*, 102 A.3d at 176.  In other words, the Sharity Trustee would have had standing to bring a suit *through* Aliera to seek a recovery *for* Aliera.  But the Aliera Trustee is already pursuing an aiding and abetting breach of fiduciary duty claim.  Thus, the Sharity Trustee has no standing to bring this claim by itself unless the Aliera Insiders personally owed a fiduciary duty to Sharity.

Accordingly, the Sharity Trustee does not have standing to bring its claim against Defendant for aiding and abetting the Aliera Insiders' breaches of fiduciary duty, and by extension, its claim for civil conspiracy based on the same tort.

### b. *The Sharity Trustee's other state law tort claims*

Next, the Court must determine whether the Sharity Trustee has standing to bring its claims for fraud, conspiracy to commit fraud, negligence, contribution, Georgia RICO, punitive damages and attorney fee claims against Defendant, both on behalf of Sharity and its Consumer Members.

43

The Court begins with whether the Sharity Trustee has adequately pled standing for injuries to Sharity at the entity level. He has. The Sharity Trustee has shown that Sharity was financially injured by having funds that Sharity was owed, falsely promised by Aliera, and obligated to pay out to Consumer Members for medical claims misappropriated for the Aliera Insiders' personal ends. This injury is fairly traceable to Defendant's provision of banking services to the Aliera Insiders, which the Aliera Insiders used to effectuate transfers to themselves and other entities they owned and controlled to the detriment of Sharity. Sharity's injury may be redressable by money damages. As such, the Sharity Trustee has established standing for its additional state law tort claims based on injury to Sharity. Thus, the Sharity Trustee has standing to sue for those enumerated state law tort claims.

### c. The Aliera Trustee's claims for fraud, conspiracy to commit fraud, and negligence

Likewise, the Aliera Trustee has standing for its fraud and conspiracy to commit fraud[24] and negligence claims to the extent that it is pursuing the claim to redress injuries to Aliera, as well as injury to Aliera's creditors in general.

---

[24] To the extent that the Aliera Trustee argues that its Count VI conspiracy to commit fraud claim is actually a conspiracy to commit a fraudulent transfer claim, the Court finds that the Aliera Trustee does have standing. It is true that "[i]n Georgia, when two or more persons participate in a scheme to effect fraudulent transfers, they may be held liable for civil conspiracy." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1334 (N.D. Ga. 2014) (citing *Miller v. Lomax*, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004) (reversing summary judgment for transferee because a jury question remained as to whether she "participated with [the transferor] in a scheme to effect fraudulent transfers" under the Georgia UFTA)). While every case the Court has found on this matter has been brought by a creditor of the debtor—the typical party that holds a fraudulent transfer claim, *see, e.g.*, *id.* (action brought by a creditor against a debtor); *Chepstow Ltd. v. Hunt*, 381 F.3d 1077 (11th Cir. 2004) (creditor filed suit against a judgment debtor); *Sauer v. Publisher Servs., Inc.*, No. 1:14-CV-698-WSD, 2016 WL 1029523 (N.D. Ga. Mar. 9, 2016) (creditor filed lawsuit against a transferee), the Aliera Trustee's claim for conspiracy to commit fraudulent transfer is surely a general claim of the creditors of the Aliera estate, who have all been injured in general by the estate's loss of funds that could have otherwise been used to pay such creditors.

As discussed above, Aliera was allegedly injured by misappropriation of its corporate funds by the Aliera Insiders.  That injury is fairly traceable to Defendant's alleged provision of banking services, which the Aliera Insiders used to effectuate these injurious transfers.  Once again, these alleged financial injuries may be redressed by money damages.[25]  Thus, only the Sharity Trustee's aiding and abetting breach of fiduciary duty claim must be dismissed for failure to allege standing.

### B. *The Equitable Defense of* In Pari Delicto

Defendant's next argument is that even if the Trustees have standing to bring these Georgia state law causes of action, these claims should be barred as a matter of law at this early stage of the proceeding based on the *in pari delicto* defense.  The *in pari delicto* defense is an equitable, affirmative defense.  Generally, "the existence of an affirmative defense will not support a motion to dismiss" unless the defense appears on the face of the complaint.  *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984).

The term *in pari delicto* means "in equal fault,"[26] and it has been recognized in federal courts as an equitable defense that stands for the proposition that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing."  Black's Law Dictionary 794 (7th ed. 1999).  The Eleventh Circuit applied this doctrine to bar a federal RICO claim under "[t]he federal law of

---

[25] For purposes of this standing analysis, which is a more rudimentary analysis than the analysis for whether the plaintiff has stated a claim, the Court takes as true the allegation that Defendant had knowledge of or made an agreement to participate in the fraudulent scheme to determine whether injury-in-fact exists as alleged.  However, the analysis of whether the Aliera Trustee stated a claim upon which relief can be granted requires a more in-depth look at whether the pleadings sufficiently alleged this knowledge or agreement.  The Court discusses that issue later in this Order.

[26] *See Pinter v. Dahl,* 486 U.S. 622, 632 (1988).

affirmative defenses" in *Edwards*, 437 F.3d at 1152.  But because the instant case

involves claims arising under Georgia law, this Court must apply Georgia's law of

equitable defenses to determine the applicability of this particular defense.  *See*

*Cohen v. Morgan Schiff & Co., Inc., (In re Friedman's Inc.) (II)*, 394 B.R. 623, 631

(S.D. Ga. 2008) (applying Georgia law for the *in pari delicto* defense to Georgia tort

claims);  *see also Am. Pegasus SPC v. Clear Skies Holding Co., LLC*, No. 1:13-CV-

03035-ELR, 2015 WL 10891937, at *23 (N.D. Ga. Sept. 22, 2015) (same);  *Hays,* 2006

WL 4448809, at *10 (same).[27]

Georgia law does recognize *in pari delicto* as an equitable defense.  *See Bell v.*

*Sasser*, 520 S.E.2d 287, 293 (Ga. Ct. App. 1999).  This defense is generally explained

by reference to O.C.G.A. § 23-1-15, which provides that "[w]hen both parties are

---

[27]  In *Kelley v BMO Harris,* the Eighth Circuit Court of Appeals reversed a substantial jury award in favor of bankruptcy trustee against the defendant because the district court determined that the *in pari delicto* defense was unavailable against the trustee.  Nos. 23-2551, 23-2632, 2024 WL 4158179 (8th Cir. Sept. 12, 2024).  That decision plainly states that it was based on the application of Minnesota state law.  "If [the debtor] had sued BMO in a Minnesota court, the defense of *in pari delicto* would have been available." *Id.* at *3.  "No Minnesota decision purports to eliminate the defense of *in pari delicto* in a bankruptcy case." *Id.* at *4.  The case before this Court is not controlled by Minnesota law, but by Georgia law, so the Court will confine its focus to Georgia law.

*BMO Harris* also discusses what it sees as a distinction between the ability of a receiver appointed by a federal court to recover claims for the benefit of creditors and a bankruptcy trustee, arguing the court appointed receiver has greater authority—or fewer limits—than a bankruptcy trustee to pursue certain types of claims.  Whether that is correct or not did not affect this Court's decision.  To the extent the distinction is viewed as important, this Court does note that the Trustees here are not bankruptcy trustees appointed pursuant to Sections 701, 702 or 1104 of the Code, but are rather liquidating agents—who could have just as easily been called Receivers or Creditor Representatives—appointed by a federal court to administer liquidation trusts for the sole benefit of creditors pursuant to Section 1123 of the Code.  For example, and in addition to the other provisions of the Aliera Trust and Aliera Plan discussed herein, Section 9.1 of the Aliera Plan provides: "The Liquidating Trustee will act for the Creditors in a fiduciary capacity as applicable to a board of directors and shall be responsible for the liquidation of the remaining Assets."  Among those assets are causes of action, which are defined in Section 1.15 of the Aliera Plan to mean "any cause of action held by the Debtors, the Estates, the Trust or any of them of any nature or type whatsoever, at law or in equity, against any person or entity."

equally at fault, equity will not interfere but will leave them where it finds them."  To the extent the Georgia state law claims asserted herein by the Trustees are subject to the defenses Defendant may have had against Aliera and Sharity under Georgia law, Defendant's defenses are also subject to any exceptions and limitations to those defenses imposed by Georgia law.  *See In re Friedman's Inc. (II)*, 394 B.R. at 631;  *see also Am. Pegasus SPC*, 2015 WL 10891937, at *23;  *Hays,* 2006 WL 4448809, at *10.

Defendant argues that the Amended Complaint is barred by the *in pari delicto* defense based on the debtor entities' alleged active participation in the wrongdoing.[28]

By contrast, the Trustees argue: (1) it is premature to determine the applicability of the affirmative defense in the context of a motion to dismiss; (2) the allegations in the Amended Complaint show that the *in pari delicto* defense does not bar the Sharity Trustee's claims; and (3) exceptions exist that prohibit the application of the *in pari delicto* defense to the Aliera Trustee's claims.

---

[28]  The Court notes that the Aliera Trustee's fraudulent transfer claims are not barred based on the *in pari delicto* defense for the reasons outlined below but also because the weight of authority establishes that these kinds of claims are not subject to this equitable defense.  *See, e.g., Kapila v. Bennett (In re Pearlman)*, 472 B.R. 115, 123 (Bankr. M.D. Fla.), *aff'd,* 478 B.R. 448 (M.D. Fla. 2012*)* ("As a general rule, '[plaintiffs] in fraudulent conveyance actions [are] not subject to defenses that could be raised against the debtor.'" (citation omitted)); *Kipperman v. Onex Corp.*, 411 B.R. 805, 880 (Bankr. N.D. Ga. 2009) (Forrester, J.) (cataloguing cases across multiple Circuits which found that the *in pari delicto* defense did not apply to fraudulent transfer claims brought by a bankruptcy trustee); *Am. Pegasus SPC v. Clear Skies Holding Co., Inc.*, 2015 WL 10891937, at *20 (N.D. Ga. Sept. 22, 2015) (Ross, J.) (finding that the equitable defense of *in pari delicto* would not apply to claims brought under GUVTA by the Joint Official Liquidators of the plaintiff entity).

One exception to the equitable defense of *in pari delicto* recognized by Georgia courts is the "innocent creditor exception." [29]  Several cases from District Courts in Georgia have held the *in pari delicto* defense may not apply where the defense would result in harm to innocent creditors.  *See, e.g.*, *In re Friedman's Inc. (II)*, 394 B.R. at 631;  *Am. Pegasus SPC*, 2015 WL 10891937, at *23;  *Hays,* 2006 WL 4448809, at *10.[30]

In *Hays*, the court dealt with the question of "whether Georgia courts would bar the Receiver from pursuing [the defendant] for the (ultimate) benefit of defrauded investors" under the doctrine of *in pari delicto*.  2006 WL 4448809, at *10.  In that case, a court-appointed receiver for a Ponzi entity sued the defendant law firm for state law professional negligence and breach of fiduciary duty where the defendant allegedly performed legal services that furthered the Ponzi entity's scheme to defraud investors.  *Id.* at *2–3.  Because the Ponzi entity itself sought the defendant's legal services to further its own fraudulent scheme, the defendant asserted the *in pari delicto* defense against the receiver's claims.  *See id.* at *3, *10.  The Honorable Charles Pannell found that "it is likely that Georgia courts would not apply the defense of *in pari delicto* under the circumstances of this case," because "Georgia courts have historically exercised their equitable powers to bar the use of equitable defenses where the result would be harm to innocent third parties, such as creditors."

---

[29] The parties did not argue about the other exceptions to the *in pari delicto* defense, the adverse interest exception, and the exception to that exception, the sole actor rule.  To the extent these are relevant to the litigation, the Court incorporates its analysis from *Health Reform Team*, 665 B.R. at 507–508 with respect to those issues into the instant case.

[30] *Edwards* was either cited in each of these opinions or discussed in the briefs, so these Courts were well aware of the Eleventh Circuit's decision applying the *in pari delicto* defense to bar *federal* RICO claims brought by the trustee of a Ponzi debtor.

*Id.* at \*10 (citing *Brooke v. Kennedy*, 158 S.E. 4, 5 (Ga. 1931) (rejecting the defense of *in pari delicto* because "[t]hese claims have come into the hands of the Receiver [appointed for the benefit of creditors] and from which creditors should be paid."). It would require a strong case for a court of equity under such circumstances to refuse creditors protection through a receiver.").[31]

Judge Pannell discussed that the *in pari delicto* defense "'is based on the principle that to give the plaintiff relief would contravene public morals and impair the good of society. Hence, it should not be applied in a case in which to withhold relief would, to a greater extent, offend public morals.'" *Hays*, 2006 WL 4448809, at \*10 (quoting *Gaines v. Wolcott*, 167 S.E.2d 366, 370 (Ga. Ct. App. 1969), *aff'd,* 169 S.E.2d 165 (Ga. 1969)). Ultimately, Judge Pannell concluded that Georgia courts "would look to the equities of the situation and refuse to bar relief where the one *in pari delicto,* here [the fraudulent entity's insider], is eliminated from the suit and the recovery would ultimately go to innocent victims." *Id*.

A couple of years after Judge Pannell's decision in *Hays,* the District Court for the Southern District of Georgia also applied the innocent creditor exception to the *in pari delicto* defense in denying a motion to dismiss the Georgia state law claims against another large national firm brought by the liquidating trustee for a

---

[31] *See also Roney v Crawford,* 68 S.E. 701, 702 (Ga. 1910) (rejecting the *in pari delicto* defense because "[t]he action by the trustee in bankruptcy is not to recover and pay a prize, but to collect . . . assets of the bankruptcy corporation for the purpose of paying legally chargeable claims against the bankrupt estate. . . . [T]he court will interfere to prevent those who have obtained money under the illegal contract, obtained money belonging to other persons on the representation that the contract was legal, from keeping the money." (citations omitted)). Although *Roney* relies, in part, on an English Chancery Court case, O.C.G.A § 23-1-2 specifically says that Georgia "equity jurisprudence embraces the same matters of jurisdiction and modes of remedy as were allowed and practiced in England."

liquidating trust approved under a Chapter 11 reorganization plan. *In re Friedman's (II)*, 394 B.R. at 631. In that case, the Honorable B. Avant Edenfield relied on the reasoning in *Hays* and also cited to *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944), which held that the equitable defense of *in pari delicto* was "'not a rigid formula.'" *In re Friedman's (II)*, 394 B.R. at 631 (citing *Johnson*, 321 U.S. at 387). Ultimately, he concluded that the "application of *in pari delicto* doctrine in Georgia is a fact intensive inquiry done on a case by case basis." *Id*. at 632.

A similar result was reached by the Honorable Eleanor Ross in the Northern District of Georgia in *Am. Pegasus SPC*, 2015 WL 10891937. In *Am. Pegasus*, the plaintiff was the debtor, albeit acting through Joint Official Liquidators ("JOLs") under the laws of the Cayman Islands. *Id*. at *4. The JOL's, on behalf of the debtor, sued the defendants—former agents of the plaintiff—for civil conspiracy and procuring breach of fiduciary duty over a leveraged buyout transaction. *See id*. at *1– 4. The defendants argued that the *in pari delicto* defense applied against the plaintiff JOLs because the principal's knowledge is imputed to the plaintiff and that the JOLs were similar to the bankruptcy trustee in *Edwards*. *Id*. at *23.

However, Judge Ross found that the application of the *in pari delicto* defense "would yield an absurd result" because its application "would ignore certain realities of the procedural and factual background of this case." *Id.* at *23. "Defendants should not be able to shield themselves by virtue of imputing the knowledge and action of [the principals] to the company" because the company was "acting by and through its JOLs, so that it may recover any assets which were illegally obtained, and then

50

distribute those assets as appropriate [only] amongst AmPeg's innocent creditors."
*Id.* She noted that the alleged wrongdoers formerly within the plaintiff entity "would
not benefit" if the plaintiff JOLs successfully prosecuted the case—only innocent
creditors. *Id.* In reaching this decision, Judge Ross followed the same line of
reasoning as *Hays* and *Friedman's* to apply Georgia's innocent creditor exception to
the *in pari delicto* defense. *Id.* (citing *Hays*, 2006 WL 4448809, at *10).

These Georgia District Courts reached these conclusions because the *in pari
delicto* defense is an equitable defense that warranted these courts to consider the
equities in the context of (a) a receiver, (b) a liquidating trustee of a trust approved
as part of a Chapter 11 plan and (c) a debtor with court supervised liquidators
attempting to recover assets for the benefit of creditors, as opposed to a situation
where one actual wrongdoer was seeking to recover against another wrongdoer.

The Georgia Supreme Court has not only considered the equities of the case in
the context of the application of the *in pari delicto* defense and determined that equity
should protect innocent creditors, but it has also done so in other contexts involving
bankruptcy trustees seeking to collect assets for the benefit of creditors.

The Eleventh Circuit Court of Appeals in *In re Icarus Holding, LLC*, certified
the question to the Georgia Supreme Court of whether Georgia law would allow a
corporation, through a bankruptcy trustee, to bring an alter ego action against its
former principal, instead of the more traditional instance where a third party creditor

would bring such a suit against the principal. 391 F.3d 1315.[32]  Even Georgia
bankruptcy courts were divided over this issue, as well as other courts around the
country.  *See In re Icarus Holding, LLC*, 391 F.3d at 1319, 1322 (discussing and citing
to cases to show how courts have been divided on the issue of whether a corporation
can bring an alter ego action against its principals).

The Georgia Supreme Court unequivocally held that Georgia's equity
principles would permit such an action by a bankruptcy trustee. *Baillie Lumber Co.
v. Thompson*, 612 S.E.2d 296, 300 (Ga. 2005).  In so ruling, the Georgia Supreme
Court found that equity favors effectuating bankruptcy policy, specifically where
"federal bankruptcy policy seeks "to protect the debtor's assets, provide temporary
relief from creditors, and further equity of distribution among the creditors by
forestalling a race to the courthouse."  *Id*. (internal quotations and citation omitted).
Further, the Georgia Supreme Court found that having a bankruptcy trustee
prosecute the general alter ego claim instead of individual creditors would "afford[]
equal treatment to all [creditors]" and would not "undercut the general bankruptcy
policy of ensuring that all similarly-situated creditors are treated fairly."  *Id*. (internal
quotations and citation omitted).  The Georgia Supreme Court also determined that
"the usual requirement of third party benefit for a veil-piercing claim is, in fact, met
in the case of an insolvent corporation under federal bankruptcy law [because the

---

[32] The Georgia Supreme Court quoted from the Third Circuit Court of Appeals about how unusual this
situation is: "It may seem strange to allow a corporation to pierce its own veil, since it cannot claim to
be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort
creditor. . . . Because piercing the corporate veil or alter ego causes of action are based on preventing
inequity or unfairness, it is not incompatible with the purposes of the doctrines to allow a debtor
corporation to pursue a claim based on this theory." *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296,
300 (Ga. 2005) (quoting *Phar-Mor, Inc. v Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3rd Cir. 1994)).

claim]. . . . will necessarily benefit third parties by providing more money with which to satisfy unsecured claims." *Id.*

The Georgia Supreme Court's decision in *Baillie Lumber* is further evidence that Georgia's equitable principles favor allowing a trustee or other creditor representative to prosecute an action that would benefit all creditors. If this Court failed to recognize the applicability of the innocent creditor exception based on the current allegations, innocent creditors would be left to their own devices, thus running afoul of the core principles as recognized by the Georgia Supreme Court, including to "further equity of distribution among the creditors by forestalling a race to the courthouse" and "providing more money with which to satisfy unsecured claims." *Id.* (internal quotation and citation omitted). As discussed above, this Court has found that the Trustees are bringing their own claims based on injury unique to the debtor estates, and any recoveries of the Trustees would ultimately be for the sole

benefit of the creditors.  As such, Georgia's equity principles would apply the innocent creditor exception to the *in pari delicto* defense.[33]

Based on the allegations in Amended Complaint and matters of public record in *Aliera* and *Sharity*, it appears that the innocent creditor exception under Georgia law would be applicable to any assertion of the *in pari delicto* defense.  As with the plaintiffs in the District Court and Georgia Supreme Court cases cited above, the Trustee plaintiffs in this case are pursuing these claims for the damage done to the

---

[33] Because the innocent creditor exception is an exception to an equitable defense in a limited factual situation, it would not be applied to many other affirmative defenses.  For example, and without intending to consider the many affirmative defenses that exist, a trustee is certainly subject to legal affirmative defenses such as payment, release, accord and satisfaction, and lack or failure of consideration to prevent a third party from having to pay twice or to pay for something for which it received no benefit.  Those legal defenses are and should be enforceable against a trustee because the debtor was not injured by the conduct of the third party.  However, the application of the equitable defense of *in pari delicto* against a trustee is different: a third party who has allegedly participated in an injury to the debtor is trying to escape liability to the detriment of innocent creditors by imputing the conduct of the now removed bad actor to a trustee.

As set forth in the cases above, Georgia courts recognize that when the wrongdoer has been removed from the debtor entity and the recovery would go for the sole benefit of innocent creditors, equity should not interfere to prevent relief for the benefit of those innocent third parties.  Even though the general rule is that a trustee steps in the shoes of the debtor for purposes of causes of action, it is also axiomatic that a trustee and the debtor are separate legal entities.  *See, e.g.*, *United States v. Annamalai*, 939 F.3d 1216, 1231 (11th Cir. 2019) ("A Chapter 11 estate, which is created by the filing of a bankruptcy petition, is separate and distinct from the corporate debtor, which 'continues to exist as a legal entity after the filing of [the] petition, whether under [C]hapter 7 or 11[.]'") (quoting 5 Collier on Bankruptcy ¶ 541.02 (16th ed. 2018)); *In re KiOR, Inc.*, 621 B.R. 313, 329 (Bankr. D. Del. 2020) ("[T]he Liquidating Trustee is not a "successor" to the Debtor under the Bankruptcy Code sections 323 or 1104, but rather is a trustee of a trust created pursuant to Bankruptcy Code section 1123(b)(3).  The Liquidating Trustee serves in a limited capacity as defined in the Confirmation Order and the Trust Agreement."); *Cohen v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (In re County Seat Stores, Inc.)*, 280 B.R. 319, 325–26 (Bankr. S.D.N.Y. 2002) ("[A] bankruptcy trustee charged with a statutory duty and endowed with special statutory powers, is an independent and disinterested entity, separate and distinct from the debtor, as well as the pre-petition company, and as such does not strictly 'stand in the shoes' of the debtor.  Nor does he assume the identity of the debtor."); *Rieser v. Baudendistel (In re Buckeye Countrymark, Inc.)*, 251 B.R. 835, 840 (Bankr. S.D. Ohio 2000) ("The trustee is not the same entity as the pre-bankruptcy debtor, but is a new entity with his own rights and duties, subject to the supervision of the bankruptcy court.").

Therefore, the innocent creditor exception recognizes that the legal and factual realities of the situation do not call for equity to intervene to aid another wrongdoer by preventing a recovery for the benefit of innocent creditors.

debtors for the sole benefit of creditors:[34] the beneficiaries of the Liquidation Trusts here only consist of creditors with allowed claims and exclude Aliera Insiders and the debtors themselves.[35]   Therefore, the debtors and the Aliera Insiders cannot participate in any recovery from the litigation.  In fact, for tax purposes, the creditor beneficiaries are treated as the grantors and owners of the respective trusts.[36]

Furthermore, although the Sharity Liquidating Trust is managed by the Sharity Trustee in accordance with the Liquidating Trust Agreement (the "Sharity Trust Agreement"), he is overseen by a Liquidating Trust Committee composed of no more than five (5) Consumer Members. [Sharity Docket No. 315-1].  The Sharity Trustee was appointed by the Consumer Members Committee[37] with input from Governmental Units holding Allowed Governmental Fines and Penalty Claims and ratified by the Bankruptcy Court.  The Aliera Trustee is similarly overseen by a

---

[34] See [Aliera Docket No. 549] (establishing that Aliera, et al. "grant, release, assign, transfer, convey, and deliver" the property of their respective estates, including causes of action, to Aliera Trustee for the benefit of those debtors' creditors);  see also [Sharity Docket No. 299] (establishing that Sharity "transfer[red], assign[ed], and deliver[ed] to [Sharity Trustee] all its respective right to and interest in and to" Sharity's causes of action, for the benefit of Sharity's creditors).

[35] See [Aliera Docket No. 566] (providing for no distribution for "Insider Claims" and that the Aliera Trustee "shall be responsible for the liquidation of the remaining Assets for the benefit of Creditors . . .); [Sharity Docket No. 343] (providing that "Sharity no longer operates as a going concern. It exists only to wind up its affairs and liquidate its assets for the benefit of its creditors, including its [Consumer] Members," and excess distributions may go to nonprofits "dedicated to serving health care and health coverage needs of uninsured individuals" or to Consumer Members as compensation for tort claims they may have held against Sharity).

[36] [Sharity Docket No. 343] ("For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its Beneficiaries. . . . [T]he Liquidating Trust's Beneficiaries will be treated as the grantors and owners [of the Liquidating Trust]."); [Aliera Docket No. 549-1] ("[T]he Liquidation Trust created hereunder be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 677 of the Internal Revenue Code. . . . The Beneficiaries will be treated as the grantor of the Liquidation Trust created hereunder.").

[37] "Consumer Member Committee" here means the Official Committee of Members appointed by the U.S. Trustee in the Sharity Chapter 11 Case on August 20, 2021." See [Sharity Docket Nos. 163, 315].

committee comprised of creditors, including two designees of the Sharity Trust and two designees of the Aliera Creditors' Committee.  More than 98% of the creditors in *Sharity* voted in favor of the Sharity Plan and more than 92% of the creditors in *Aliera* voted in favor of the Aliera Plan.

As previously discussed, Georgia courts have held that "the doctrine of *in pari delicto* is based on the principle that to give the plaintiff relief would contravene public morals and impair the good of society.  Hence it should not be applied in a case in which to withhold relief would, to a greater extent, offend public morals."  *In re Friedman's Inc.*, 394 B.R. at 631 (internal quotations and citation omitted);  *see also Hays,* 2006 WL 4448809, at *10.  At least three District Court judges in Georgia have determined that application of the *in pari delicto* defense under facts similar to those before this Court would, to a greater extent, offend public morals and impair the good of society because innocent creditors would be harmed.  Based on the record before this Court at this stage of the proceeding, this Court cannot see how the prosecution of these Georgia state law claims against Defendant by these Trustees who are asserting claims for the sole benefit of innocent creditors would offend public morals and impair the good of society.

Upon consideration of the allegations and matters of public record before it at this time, this Court agrees with (a) Judge Pannell's reasoning that to prevent the Trustees from pursing a recovery for injury to their estates for the sole benefit of innocent creditors based on the *in pari delicto* defense would offend public morals and impair the good of society, and (b) Judge Ross's reasoning that to prevent the Trustees

from pursuing a recovery for injury to their estates for the sole benefit of innocent creditors based on the *in pari delicto* defense would yield "an absurd result" under Georgia law.[38]

The innocent creditor exception to the equitable defense of *in pari delicto* in Georgia considers whether the equities of the situation exist to support the public policy basis for the defense. Where the insider wrongdoer has been removed and the recovery will be going exclusively to innocent creditors, the innocent creditor exception prevents the other wrongdoer from escaping liability for its actions at the expense of those innocent creditors.[39] And so, to deny the Trustees the opportunity to pursue a recovery here on the basis of the *in pari delicto* defense at the motion to dismiss stage would not be a proper use of equity. It would certainly seem that the application of such an equitable defense in the face of such an equitable exception should at a minimum be a question of fact, rather than applying the defense as a

---

[38] One such absurd result that could arise from the rigid application of the *in pari delicto* defense would be the idea that a Trustee can recover from a debtor's officers and directors for breach of fiduciary duty but not recover from those who aided and abetted or conspired with those officers and directors in the breach of that very same fiduciary duty. *See Off. Comm. of Unsecured Creditors of The Aliera Companies, Inc. v. Steele (In re The Aliera Companies, Inc.)*, Ch. 11 Case No. 21-11548, Adv. No. 23-50433 (Bankr. D. Del. July 7, 2023) (in which the Official Committee of Unsecured Creditors of Aliera—the predecessor to the Aliera Trustee in that suit—and the Sharity Trustee filed suit against the Aliera Insiders for *inter alia*, breach of fiduciary duty). To permit a trustee to sue for damages against one wrongdoer but prevent him or her from suing the other who aided and abetted the breach is clearly an "absurd" result.

[39] Although it has been argued that the *in pari delicto* defense is appropriate because innocent creditors such as these have their own damages for which they may be able to sue a defendant directly, the damages here may only average about $3,700 per claimant (Sharity allegedly covered approximately 98,000 households and has an allowed claim in the *Aliera* case of $366,000,000). Furthermore, the statute of limitations may have expired or will be expiring soon on these claims in the hands of creditors and, as discussed previously and in *Plaza Mortgage,* to the extent any such claims are asserted against Defendant, the Court can easily take that into account in the award of any damages. Finally, whether the innocent creditors here have their own remedies, impractical and inefficient as they may be, does not negate the fact that the Trustees have alleged injury to the debtor estates for which they have standing to sue, and for which the sole beneficiary of any recovery would be innocent creditors.

"rigid formula," contrary to the Supreme Court's ruling, as noted by Judge Edenfield. *In re Friedman's*, 394 B.R. at 631 (quoting *Johnson*, 321 U.S. at 387).[40]

Therefore, based on the allegations in the Amended Complaint and the public record, there is not a sufficient basis to rule as a matter of law that the debtors that the Trustees, as holders of causes of action of the Debtors' estates, were *in pari delicto*—in equal fault—with Defendant at this stage of the proceeding. As such, the Motion for that basis cannot be granted. Although the Court concludes that the *in pari delicto* defense shall not bar the Trustees' claims at this stage of the proceedings, Defendant may still assert this affirmative defense against Trustees, including in its answer and future dispositive pleadings. The Court now moves onto addressing whether the Trustees have stated claims upon which relief may be granted.

---

[40] As we will see below, Georgia—and other—courts have adopted the adverse interest exception to the equitable defense of *in pari delicto*. The reason the courts created this adverse interest exception is because it was equitable to do so. Courts have also created an exception to the exception, the sole actor rule, for the same reason. Georgia courts have likewise created the innocent creditor exception to the *in pari delicto* defense because it was equitable to do so.

## II. Statement of a Claim[41]

Defendant argues that each Count of the Amended Complaint must be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  For the reasons discussed below, the Court agrees that dismissal is appropriate for all Counts except one: the Sharity Trustee's fraud claim.

### A. *The Aliera Trustee's Fraudulent Transfer Claims*

The Aliera Trustee has alleged three fraudulent transfer Counts (I–III) under Georgia Uniform Voidable Transfer Act, brought through 11 U.S.C. § 544(b), as well as a recovery of transfer Count (IV) brought under 11 U.S.C. § 550.  In alleging these causes of action, the Aliera Trustee seeks to recover payments for account fees and

---

[41]  To the extent that Defendant moves to require a more definite statement under Fed. R. Civ. P. 12(e) by arguing that the Amended Complaint is a shotgun pleading, the Court denies that request.  A motion for more definite statement shall only be granted if the pleading "fails to specify the allegations in a manner that provides sufficient notice." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).  "Other courts within this Circuit have applied a 'high standard' in ruling on 12(e) motions, noting that 12(e) motions are 'not favored in light of the federal system's liberal discovery practice.'" *Julmist v. Owners Ins. Co.*, No. 1:21-cv-01506-SDG, 2021 WL 3472814, at *2 (N.D. Ga. Aug. 6, 2021) (citing *Smith v. Transcon. Ins. Co.*, No. 05-CV-22864-KLEIN, 2006 WL 8433250, at *1 (S.D. Fla. Mar. 30, 2006) (quoting *Beacon College, Inc. v. Phila. Indem. Ins. Co.*, No. 505CV374OC10GRJ, 2006 WL 485101, at *2 (M.D. Fla. Feb. 28, 2006))).

Rule 12(e)'s purpose is to give the defendant enough notice to be able to respond and defend itself in its Answer, not to confer standing. Where a defendant is equipped with sufficient notice to be able to raise a 12(b)(6) motion, that defendant is equipped with sufficient notice to answer. *See Julmist*, 2021 WL 3472814, at *3 (concluding that where "the factual and legal bases for Plaintiffs' allegations are sufficiently clear for [the defendant] to argue that . . . [the plaintiff] has no standing[,] . . . [s]uch arguments are inconsistent with [the defendant's] position that it has insufficient notice to reasonably prepare a defense because they are, in fact, defenses" that can be raised in an answer).  Therefore, because Defendant here had sufficient notice to raise arguments about standing, *in pari delicto*, and failure to state a claim in its Motion to Dismiss, the Court finds that a more definite statement from the Trustees is unnecessary.

service charges made by Aliera to Defendant (the "Transfers").[42]   Counts I and III
allege constructive fraudulent transfers under O.C.G.A. § 18-2-75(a) and § 18-2-
74(a)(2) and Count II alleges an actual fraudulent transfer under O.C.G.A. § 18-2-
74(a)(1).   There is some overlap between the elements of these statutes, so the Court
begins its analysis there.

Each of these statutes requires a plaintiff to prove that a transfer was made
by a debtor.  *See* O.C.G.A. §§ 18-2-74(a)(1) and (2), and 18-2-75(a). Prosecution of a
claim under O.C.G.A. § 18-2-74(a) is allowed regardless of "whether [a] creditor's
claim arose before or after the transfer was made," while prosecution of a O.C.G.A. §
18-2-75(a) claim requires that a creditor's "claim arose before the transfer was made."

Here, the alleged Transfers by Aliera to Defendant were in the form of
payments for account fees and service charges.   Additionally, there are sufficient
allegations that there was a creditor whose claim arose prior to at least several of the
transfers as a result of Aliera's sale of fraudulent HCSM plans to unsuspecting
Consumer Members.   Thus, these two elements of each claim have been plausibly
pled.

---

[42] "When trustees seek recovery of allegedly fraudulent conveyances from banks, the outcome of the
cases turn on whether the banks actually controlled the funds or merely served as conduits, holding
money that was in fact controlled by either the transferor or the real transferee." *In re Chase &
Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988).  Here, just as a debtor's payment of a loan would
effectuate a transfer of funds that is thereafter exclusively controlled by the transferee bank, payment
of fees and charges to a bank likewise gives complete control over those funds to the bank.  This is
merely to say that bank fees and service charges are not *per se* unrecoverable from a bank under
fraudulent transfer law.  The elements of the claim must still be met, such as demonstrating whether
the debtor made the transfer with fraudulent intent or whether the transfer was not made for
reasonably equivalent value. *See* O.C.G.A. § 18-2-74, -75.

### 1. Constructive Fraudulent Transfers and the Element of Reasonably Equivalent Value

The Court begins with Count I of the Amended Complaint. To state a claim under O.C.G.A. § 18-2-75(a) for a constructive fraudulent transfer, a plaintiff must show that (1) there was a transfer made by a debtor, (2) there was a creditor whose claim arose before the transfer was made, (3) reasonably equivalent value was not received for the transfer, and (4) debtor was insolvent at the time or became insolvent as a result of the transfer. Count III likewise contains a reasonably equivalent value requirement. *See* O.C.G.A. § 18-2-74(a)(2). As discussed above, the first two elements have been satisfied. But the Aliera Trustee has not met its burden in pleading the reasonably equivalent value element.

The Aliera Trustee's argument that the question of whether a debtor received reasonably equivalent value for a transfer is ultimately a question of fact is correct, but the trustee must still allege facts sufficient to pass muster at the pleading stage. *See In re Chase & Sanborn Corp.*, 904 F.2d 588, 593–94 (11th Cir. 1990) (finding that reasonably equivalent value is a question of fact but still affirming the bankruptcy court's decision that reasonably equivalent value was not sufficiently pled). At oral argument, the Aliera Trustee further invoked the so-called Ponzi presumption to contend that Aliera received no value for services provided by Defendant. *See Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 859 (D. Utah 1987) (in a case dealing with a Ponzi scheme, finding that the debtor received no value from the use of investors' funds except to perpetuate the fraudulent investment scheme).

By contrast, Defendant argues that where a transaction was made at arm's length the transaction was made for reasonably equivalent value, regardless of whether the debtor was a Ponzi entity. *See, e.g.*, *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.*) 309 F.3d 1325, 1332 (11th Cir. 2002) ("[A] determination of whether value was given under [11 U.S.C. §] 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."); *McHenry v. Dillworth (In re Caribbean Fuels Am., Inc.)*, 688 F. App'x 890, 894-95 (11th Cir. 2017) ("[U]nder [11 U.S.C.] § 548, in assessing the 'value' of property, goods, or services provided directly to a debtor, the question is not whether the debtor subjectively benefitted from the property it received; the operative question is whether the property, goods, or services provided had objective value."). Courts in other jurisdictions have found that where a bank's provision of services to the transferor is not "unreasonable, non-market, or above and beyond what [the bank] typically charges in the ordinary course of business," the debtor's payment of the bank fees and service charges were made for reasonably equivalent value. *Terry v. Frost Bank (In re Chris Pettit & Assocs., P.C.)*, Case No. 22-50591-CAG, Adv. No. 24-05034-CAG, 2024 WL 5316334, at *9 (Bankr. W.D. Tex. Dec. 16, 2024); *see also Cook v. Roberts (In re Yahweh Ctr., Inc.)*, Case No. 16-04306-5-JNC2, Adv. No. 18-00082-5-JNC, 2019 WL 1325032, at *4–5 (Bankr. E.D.N.C. Mar. 22, 2019) (finding that the trustee failed to sufficiently plead reasonably equivalent value where "[t]here [was] simply no information other than that the fees were

charged, with a conclusory allegation that the debtor did not receive reasonably equivalent value for the fees.").

The Court agrees with Defendant's argument. For purposes of a constructive fraudulent transfer claim, reasonably equivalent value is based on the objective value of the goods and services received, regardless of "the impact that the goods and services had on the [debtor]." *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d at 1332.

The alleged Transfers here involved payments by Aliera for account fees and service charges to Defendant in exchange for routine banking services, namely opening and maintaining bank accounts, and receiving and transferring monies with those accounts. Nothing in the Amended Complaint alleges that Aliera paid more than Defendant's standard rate account fees and service charges nor that Aliera failed to receive certain bargained-for banking services from Defendant. On a purely transactional level, without looking at the intent or motivations of the parties, Aliera

received the banking services that it contracted for.  For those reasons, the Aliera Trustee's constructive fraudulent transfer claims must be dismissed.[43]

## 2. Actual Fraudulent Transfer

Next, the Court turns to Count II of the Amended Complaint, which alleges that Defendant received actual fraudulent transfers from Aliera under O.C.G.A. § 18-2-74(a)(1).  A claim under this statute requires the plaintiff to allege that there was (1) a transfer (2) made by the debtor (3) either before or after a creditor's claim against the debtor arose, and (4) the debtor's actual intent for making the transfer was to hinder, delay, or defraud a creditor.  As discussed above, the first three elements have been alleged. That leaves the question of whether it was plausibly alleged that the Transfers were made to hinder, delay, or defraud Aliera's creditors.  Again, the Court finds that they were not.

The Aliera Trustee argues that the "Ponzi scheme presumption" applies in this case, such that the Court must presume the Transfers were made with fraudulent

---

[43] Although *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325, is technically non-binding precedent in this case because it analyzes fraudulent transfer claims under § 548, the Court is not inclined to buck the holding in that case.  Chief among those reasons is that § 548 is substantially similar to both O.C.G.A. §§ 18-2-74 and 18-2-75 in substance and analysis.  *See In re LendXFinancial, LLC*, No. 10-76803-MGD, 2012 WL 1597394, at *7, *12 (Bankr. N.D. Ga. Mar. 19, 2012) (Diehl, J.) (noting that the analysis of § 548 claims is substantially the same as its equivalent counterparts in the Georgia Code, O.C.G.A. §§ 18-2-74(a) and 18-2-75).  Secondly, it would open a can of worms if the Court accepted the Aliera Trustee's argument in favor of a sweeping rule that *any* transfer made by a Ponzi-like entity is per se not made for reasonably equivalent value.  To illustrate the problem created by this proposed rule, take the following example:

To start its operations, a Ponzi-like debtor leases a commercial office space for the typical monthly rate in that location.  To keep the lights on, the debtor pays the utility company the standard rate for electricity in the office.  The debtor buys computers from an electronics store for the same price as any other purchaser, which will be used to carry out the fraudulent business.  Under the Aliera Trustee's argument, the landlord, power company, and electronics store are liable for constructive fraudulent transfers.  Objectively speaking, however, if Aliera paid the standard market rate for those products and services, then Aliera itself received value for its payments, regardless of how Aliera decided to use those services.

intent.  That rule provides that "[w]ith respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering the payments under §§ 548(a) and 544(b)." *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011).[44]  That begs the question of whether Aliera was plausibly alleged to have operated a Ponzi scheme.

"A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be high returns, but which are in reality a return of their own principal or that of other investors." *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014) (citing *In re Fin. Federated Title & Trust, Inc.,* 309 F.3d at 1327 n.1); *see also Perkins v. Haines*, 661 F.3d 623, 625 (11th Cir. 2011) ("The essence of a Ponzi scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts."); *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010), *aff'd,* 478 B.R. 448 (M.D. Fla. 2012)  ("A Ponzi scheme is generally defined as a 'phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.'" (quoting *United States v. Silvestri,* 409 F.3d 1311, 1317 n.6 (11th Cir. 2005)).

Just as important in this case is knowing what a Ponzi scheme is not.  *In re Pearlman* provides guidance, 440 B.R. 569.  There, the debtor conducted two

---

[44] In *Perkins*, the Eleventh Circuit held that the trustee of the Ponzi debtor could recover the false profits from transfers made by the debtor to a transferee-defendant investor to the extent that the defendant received more than the principal of his initial investment. *Id.* at 627.  The Court did not apply the presumption to permit the recovery of the entire transfer made to the defendant.

Case 23-05215-jrs    Doc 55    Filed 09/08/25    Entered 09/08/25 13:49:32    Desc Main
Document        Page 66 of 123

traditional Ponzi schemes and a third scheme whereby the debtor "fraudulently obtained numerous loans from various banks" that he would use to pay other bank loans or investors that were victims of two Ponzi schemes. *Id.* at 573. The court determined that the bank loan scheme did not fit the definition of a Ponzi scheme because bank loans are not investments "by any definition," and therefore the trustee was not entitled to the Ponzi presumption for its fraudulent transfer claims involving those particular transfers. *Id.* at 575.[45]

With this in mind, the Amended Complaint does not show that Aliera operated a Ponzi scheme because it did not solicit investments from Consumer Members with a promise of high returns. Instead, Aliera allegedly sold phony insurance/HCSM plans to Consumer Members with a false promise of pooling the money to pay the medical claims of Consumer Members. Aliera did not pitch its business to potential customers as a "get-rich-quick" investment scheme—nor does one ordinarily expect to make a profit from buying health insurance. Health insurance and HCSMs are designed to cover, at least partially, the costs of certain medical expenses. Payments for health insurance are not designed to increase one's income but to reduce one's expenses. One cannot call their health insurer to recoup all of their payments with

---

[45] It is also worth noting that courts have begun to move away from recognizing the Ponzi presumption because it "allow[s] a [plaintiff] to bypass the proof requirements of a fraudulent transfer claim." *Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 384 (D. Minn. 2016) (internal quotations and citation omitted); *see also Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 128 (Tex. 2019) (failing to acknowledge the existence of a Ponzi presumption for actual fraudulent transfer claim related to a Ponzi debtor and instead establishing that the nonexclusive badges of fraud may be used to show fraudulent intent). "[T]he asset-by-asset and transfer-by-transfer nature of the inquiry under [the uniform fraudulent transfer act] requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Stoebner*, 562 B.R. at 384 (internal quotations and citation omitted).

interest like one can with equity investments. There are "real differences between the two concepts, most notably the contractual [benefit plan with insurance] versus the unknown risk premium of equity investments." *In re Pearlman*, 440 B.R. at 575. There are also no allegations that Aliera promised benefits any better than any run-of-the-mill health insurance plan, although there is an allegation that Aliera charged at a lower price-point than ACA-compliant health insurance plans. In that sense, there was no promise of high returns from these plans—another hallmark of a Ponzi scheme.[46]

The Aliera Trustee is correct that some courts have allowed an actual fraudulent transfer claim to survive a motion to dismiss based on the so-called Ponzi presumption even where the debtor's fraud scheme did not fit the traditional definition of a Ponzi scheme. *See, e.g.*, *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 732 (Bankr. D.N.J. 2009) (finding that the trustee's actual fraudulent transfer claim survived the motion to dismiss because "the question of whether the Trustee can employ the 'Ponzi scheme route' to establish the intent prong . . . requires findings of fact exceeding the scope of this motion," where the debtor ran a telecommunication sales scheme); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 363 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) (dealing

---

[46] The rule the Aliera Trustee asks the Court to invoke is a Ponzi scheme presumption, not a fraud scheme presumption. If the Court recognized this scheme as a Ponzi scheme merely because new customers have to buy in to keep the business afloat, where does it end? Imagine a company advertising itself as selling designer shoes but actually delivering cheap knock-offs to its customers, while its insiders abscond with the profits from the company's sales. That company would surely have to continually find new customers to keep its scheme alive and to pay for claims by older customers. If merely needing to find new customers to prop up a fraudulent business makes that business a Ponzi scheme, then any fraud scheme is arguably a Ponzi scheme because most defrauded customers would not come back for seconds.

with an investment fund that began as a legitimate business but subsequently covered up losses by falsifying its financial disclosures and misrepresented its investment performances, using money from newer investors to pay older ones). *But see Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp In'tl Corp)*, 403 F.3d 43 (2d Cir. 2005) (failing to apply the Ponzi presumption to fraudulent transfer claims related to a debtor that obtained loans from various banks and lenders using falsified financial records and then diverted those monies to its insiders).

But even in those cases, the trial courts still found that numerous badges of fraud were alleged or were indicated to exist in the filings such that the court granted leave amend the complaint. *See In re Norvergence, Inc.*, 405 B.R. at 733 ("On its face, the Complaint is bereft of specific badges of fraud pleading. Only in the Omnibus Sur–Reply does the Trustee address some of the badges of fraud. . . . The Court, however, declines to dismiss [the fraudulent transfer counts] at this time and will direct the Trustee to amend the Complaint to incorporate and plead the badges of fraud."); *In re Bayou Grp., LLC*, 363 B.R. at 634 ("Putting aside the Ponzi scheme presumption, the "badges of fraud" alleged in the amended complaints are more than ample to comply" with Rule 9(b)'s heightened pleading standard.).[47]

---

[47] Again, like its constructive fraudulent transfer argument, the Aliera Trustee takes an extreme position that *any* transfers made by Aliera are recoverable as actual fraudulent transfers due to the Ponzi presumption—payments to landlords for commercial leases, payments to the utility company for electricity for said lease, payments to an electronic store for computers used by Aliera, payments to the internet service provider for internet at Aliera's headquarters. The list goes on and on. This could call into question the very policy behind fraudulent transfer statutes. Fraudulent transfers deplete the debtor's estate to the detriment of creditors. Ordinary course business expenses do not deplete the estate because there would be no estate without these kinds of expenses.

Even still, only two badges of fraud were pleaded: insolvency and threat of lawsuits. However, those are not enough here. The only other badges of fraud mentioned by the Aliera Trustee at oral argument were related to Aliera's transfers from the Mother Account to the Aliera Insiders and brokers.[48]

Courts look at circumstantial allegations, or "badges of fraud," to determine whether the debtor made the transfers with fraudulent intent. *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998). Georgia's actual fraudulent transfer statute, O.C.G.A. § 18-2-74(b), includes a list of common badges:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;

---

[48] Specifically, the Aliera Trustee argued the following:

[L]et's take a look at the badges. So, we have of course the insolvency at the time of the Transfers. . . . Secondly, concealment and commingling. We know there were other accounts set up at Wells Fargo and these other banks, which were used to transfer funds out of the Mother Account where [Consumer] Members' money went for health care to these other accounts that were owned and controlled by Moses and Shelley Steele, which were then absconded with and used to buy private property um, you know, to enrich basically Aliera Insiders in a very direct way. . . . Other badges of fraud: transfers to Aliera Insiders and controlled entities. That one's obvious here. We already pled; the Court is very familiar with the way that these monies were transferred, uh, from the one Mother Account to the various other accounts, which were then taken by the Aliera Insiders. Threats of lawsuits and regulatory actions [discussing the Unity lawsuit and the regulatory actions taken against Aliera, which began at least two years *after* Aliera established its banking relationship with Defendant].

April 10 Hearing at 1:47:15 P.M., *Aliera LT, LLC v. Wells Fargo Bank, N.A.*, Adv. No. 23-05215-JRS (Bankr. N.D. Ga.). Simply put, none of these purported badges relate to the Transfers of bank fees and service charges from Aliera to Defendant. They certainly plead and argue that other transfers from Aliera to the Aliera Insiders may be fraudulent, but that is not at issue here.

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Generally, "showing only one badge of fraud may be insufficient to establish [fraudulent] intent." *GMI Grp., Inc. v. Unique Funding Sols. (In re GMI Grp., Inc.), LLC*, 606 B.R. 467, 469 (Bankr. N.D. Ga. 2019).[49]

The Court begins with the lawsuit badge. Here, we have a debtor that entered an arm's length agreement for banking services with Defendant, a non-insider of the debtor, and paid for those services at the regular rate charged by Defendant while the debtor happened to be insolvent. There are no allegations that Aliera kept control of the monies it paid to Defendant, that the Transfers constituted substantially all of Aliera's assets, or otherwise. Arguably Aliera was sued or threatened with lawsuits prior to some Transfers to Defendant, but the allegations show that Aliera was also made Transfers *before* Aliera was threatened with or party to the lawsuits and

---

[49] Even though this Court noted that one badge of fraud may be sufficient to meet the intent element of O.C.G.A. § 18-2-74(a)(1) in the Order on Motion to Dismiss in *Aliera LT, LLC v. United States of America*, the Court did not make its ruling based on one badge of fraud alone, but instead found that fraud was well-pled where the complaint in that case contained "numerous badges of fraud." *See* Order on Motion to Dismiss at 14, *Aliera LT, LLC v. United States of America (In re Aliera Cos., Inc.)*, Adv. No. 23-05213-JRS (Bankr. N.D. Ga. July 30, 2024), ECF No. 9 (Sacca, J.). Even the case the Court cited in support of the above proposition likewise found that the plaintiff "pled several badges of fraud." *Kipperman v. Onex Corp.*, 2007 WL 2872463, at *9. Also worth mentioning is that in a subsequent order in *Kipperman*, the court likewise acknowledged that "[t]here is no magic formulation. One badge may be enough; many badges may not be enough." *Kipperman v. Onex Corp.*, No. 1:05-CV-01242-JOF, 2010 WL 761227, at *4 (N.D. Ga. Mar. 2, 2010).

regulatory actions mentioned in the Amended Complaint.  The Court thus views the lawsuit badge as being irrelevant in this case.

To wrap up this point, the allegation of Aliera's insolvency by itself is not sufficient to establish that Aliera made the Transfers with actual fraudulent intent at the pleading stage.[50]  Businesses and people partake in regular transactions while insolvent all the time—just as an insolvent person must buy groceries at the store to sustain himself, the entity pays account fees and service charges to its bank to sustain its business and have access to capital.  Thus, the badges of fraud argument does not hold water for the Aliera Trustee here.

Not only did the Aliera Trustee fail to plead a Ponzi scheme, but it also failed to allege any badges of fraud that give rise to an inference that Aliera acted with actual fraudulent intent when paying its regular bank account fees and service charges.  For those reasons, the Court finds that the Aliera Trustee failed to state a claim for actual fraudulent transfer in Count II of its Amended Complaint. Accordingly, Count II must be dismissed.

To summarize, the Aliera Trustee has not sufficiently pled its constructive fraudulent transfer claims because there are no allegations demonstrating that Aliera received less than reasonably equivalent value when it effectuated the Transfers to Defendant in exchange for banking services.  Additionally, the Aliera

---

[50] The allegations in the Amended Complaint paint a picture that Aliera operated a fraudulent business at or around the time of its inception and was insolvent at that time because Aliera accrued liabilities for fraud and related torts each time it sold an HCSM plan.  In other words, whenever Aliera received payments from Consumer Members, it accrued contingent liabilities it could not pay because the Aliera Insiders looted the business and paid exorbitant commissions to brokers and intended to do so from the beginning.

Trustee has not sufficiently pleaded an actual fraudulent transfer claim because the allegations do not show that Aliera was either a Ponzi scheme entitled to the Ponzi presumption nor that Aliera acted with fraudulent intent when making the Transfers in exchange for banking services. As such, Counts I–IV of the Amended Complaint pertaining to fraudulent transfers and the recovery thereof shall be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

### B. The Trustees' Aiding and Abetting Torts Claims

#### 1. Fraud

The Trustees have alleged that Defendant committed fraud and aided and abetted fraud in Count V of the Amended Complaint. The fraudulent scheme the Trustees refer to in Count V is the

> operation of a false HCSM that caused [Consumer] Members' payments to be paid to Debtors utilizing Defendant's bank; marketing and representing Trinity health care plans as HCSM plans even though Aliera Insiders knew that Trinity could not qualify as a legitimate HCSM; misrepresenting that "up to 40% of your member contributions goes toward the administration of the plan and other general overhead costs to successfully carry out the duties of administering these services;" transferring some or all of those funds to the [Aliera] Insiders and Defendant; and rendering Sharity insolvent and unable to pay [Consumer] Members' medical expenses and resulting in Aliera's arm's length creditors not receiving payment on their claims.

(Am. Compl. ¶ 149, ECF No. 24). To summarize, the fraud claim is based on the HCSM plans being unauthorized insurance; Sharity/Trinity not being qualified to sell HCSM plans; false representations to the Consumer Members; and looting by the Aliera Insiders.

To state a claim for fraud, a plaintiff must plead the following elements: "[1] a false representation by a defendant, [2] scienter, [3] intention to induce the plaintiff to act or refrain from acting, [4] justifiable reliance by plaintiff, and [5] damage to plaintiff." *Roberts v. Nessim*, 676 S.E.2d 734, 739 (Ga. Ct. App. 2009). However, there are additional elements when the defendant "aids and abets" fraud in Georgia. *See Siavage v. Gandy*, 829 S.E.2d 787, 790 (Ga. Ct. App. 2019). The Court will delve into these after briefly discussing why the Aliera Trustee has not stated a fraud claim.

### a. The Aliera Trustee's Fraud Claim

The Aliera Trustee makes two distinct arguments for why it stated a claim for fraud. Neither are persuasive.

First, it argues that because Georgia courts have authorized an award of so-called general and punitive damages for fraudulent transfer claims, this gives rise to an independent fraud claim. *See Interfinancial Midtown, Inc. v. Choate Constr. Co.*, 806 S.E.2d 255, 261–64 (Ga. Ct. App. 2017) ("[W]e hold that Georgia law allowing the recovery of general and punitive damages for fraudulent conveyances survived the enactment of Georgia's UFTA."). This theory of recovery fails because, as the Court discussed above, the Aliera Trustee has not stated a fraudulent transfer claim.

The other argument that the Aliera Trustee gave is that the "fraud" that Defendant knowingly participated in was the Aliera Insiders' looting of Aliera and Sharity. *See* April 10, 2025 Hearing at 2:47:29 P.M. ("What is the underlying fraud alleged that the Insiders did as to Aliera? And the answer is, they looted the company."). However, that is not what fraud is. Fraud requires a false

73

representation to have been made to the plaintiff. *Roberts*, 676 S.E.2d at 739. There is not a single allegation of a false representation made to Aliera in the Amended Complaint. This is fatal to the Aliera Trustee's fraud count. Accordingly, Count V shall be dismissed for failure to state a claim with respect to the Aliera Trustee, because the Amended Complaint lacks allegations of an underlying fraud committed against Aliera.

### b. The Sharity Trustee's Fraud Claim

Unlike his co-plaintiff, the Sharity Trustee has stated an underlying fraud by Aliera against Trinity,[51] which will be discussed below. However, Georgia law also requires a showing of two additional elements to state a fraud claim under an aiding and abetting theory.

Although *Siavage* recognized that a distinct tort of aiding and abetting fraud does not exist under Georgia law, that court did acknowledge that the additional element of "knowing[] participat[ion] in a fraud" is applicable where the defendant is an accomplice to the primary wrongdoer. *See id.* (internal quotations and citation omitted). Put differently, a person is liable for the tortious conduct of another if he "'knows that the other's conduct constitutes a [tort] and gives substantial assistance or encouragement to the other" to engage in such tortious conduct. *Peterson v. Aaron's, Inc.*, 108 F. Supp. 3d 1352, 1357 (quoting *Madden v. Fulton Cnty.*, 115 S.E.2d 406, 409 (Ga. Ct. App. 1960)). This echoes the elements of aiding and abetting fraud

---

[51] As the Court noted previously in this Order, Sharity and Trinity are the same entity by a different name. Because the well-pleaded facts related to the Sharity Trustee's claim occurred prior to the name change, the Court will refer to this claim as being committed against "Trinity" for the sake of maintaining a proper timeline of events.

in other jurisdictions, which recognize that aiding and abetting fraud requires the plaintiff to show (1) the existence of the underlying fraud, (2) the defendant's knowledge of the fraud, and (3) that the defendant provided substantial assistance to the commission of the fraud.  *See, e.g., Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76 (Pa. 2023) (Pennsylvania law); *Gilison v. Flagler Bank,* 303 So. 3d 999, 1002 (Fla. Dist. Ct. App. 2020) (Florida law); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (N.Y. App. Div. 2009) (New York law); *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 784 (N.J. App. Div. 2006) (New Jersey law); *see also Matrix Parent, Inc. v. Audax Mgmt. Co., LLC*, 319 A.3d 909, 942 (Del. Super. Ct. 2024) (finding that Delaware law "similarly requires that the defendant 'knowingly assisted' the fraud.").[52]

### i.   The Underlying Fraud

The Sharity Trustee has sufficiently pled an underlying fraud committed against Trinity.  Aliera and the Aliera Insiders, through the Management Agreement, falsely represented to Trinity that Aliera would administer health care plans for

---

[52] *See GSR Markets Ltd. v. McDonald*, No. 23-11222, 2024 WL 3311315, at *2 (11th Cir. July 5, 2024) ("[W]e 'presume that [Georgia] courts would adopt the majority view on a legal issue in the absence of indications to the contrary.' *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1358 (11th Cir. 2022)").

Trinity.[53]  This included promises to receive and process medical claims from Consumer Members and to fund Trinity's claims account.  But that account was not funded for such payments.  Instead, that claims account was kept at a zero balance for the first several months of Aliera's and Trinity's business arrangement.  Even after that, the account was only nominally funded to keep the accounts operational rather than for meaningful payment of medical claims.  Thus, we have a false representation.

The allegations further plausibly allege that at the time the Management Agreement was entered into, Aliera and the Aliera Insiders never intended to (1) properly process medical claims of Consumer Members, (2) deposit funds in Trinity's claims account for payment to health care providers, nor (3) faithfully carry out the agreement between the parties.  Aliera and the Aliera Insiders knew and intended not to fund the claims accounts prior to entering the Management Agreement, as their scheme was designed around selling fraudulent insurance and stealing the money Aliera received from the scheme, rather than meaningfully transferring

---

[53] Effective as of January 1, 2020, more than a year after Trinity entered into the 2018 Management Agreement with Aliera, Sharity f/k/a Trinity entered into new Subsidiary Agreements to perform similar services to what Aliera had performed to the detriment of Trinity even though Aliera had allegedly grossly underfunded Sharity/Trinity for the entire term of the Management Agreement.  The Sharity Trustee pled that (1) Trinity had an independent structure by late 2019, but (2) its ability to act independently was constrained by the Aliera Insiders' continued control of Trinity's assets.  Despite its newfound independence, a $20 million dollar backlog of approved claims, and the slew of regulatory actions taken against Aliera and Trinity, Trinity still signed agreements with Aliera's Subsidiaries that maintained the status quo from the 2018 Management Agreement. These allegations do not make it plausible that Trinity reasonably or justifiably relied on any representations that the Subsidiaries would perform under these new agreements after Aleira failed to perform the 2018 Management Agreement.  *See Freebirds LLC v. Coca-Cola Co.*, 883 S.E.2d 388, 393 (Ga. Ct. App. 2023) ("Misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence.").  Thus, only the Management Agreement forms the basis for the Sharity Trustee's fraud claim.

money to Trinity for the payment of Consumer Members' claims.  Instead, they sought to use Trinity as a vehicle to sell fraudulent insurance plans, receive payment directly from Consumer Members, while refusing to fairly process claims and fund Trinity's claims account.  Therefore, the Sharity Trustee has established scienter on the part of Aliera and the Aliera Insiders.

Next, it is clear that the Aliera Insiders and Aliera intended to induce Thead into entering the Management Agreement on Trinity's behalf because the Aliera Insiders' allegedly sought to continue their fraud scheme by using Trinity as their associated HCSM in light of the Aliera-Unity relationship unraveling.  To induce Trinity into entering the fraudulent Management Agreement, the Aliera Insiders appointed their trusting but naïve friend as CEO of Trinity to enter into the agreement to carry on the scheme, who was justified in his reliance on the Aliera Insiders because he had previously worked for Aliera, was a personal friend of the Aliera Insiders, and did not know about the Aliera Insiders' scheme to loot the company.  In other words, he had no reason to distrust his friends and former employer when they appointed him as Trinity's CEO to enter into the Management Agreement.  Finally, Trinity was damaged through Aliera and the Aliera Insiders' failure to properly fund Trinity's claims account.  Trinity was given little-to-no money to pay for Consumer Members' medical claims and money that it was owed was instead stolen by Aliera's Insiders.  This left Trinity insolvent with hundreds of millions of dollars in liabilities to Consumer Members for wrongfully delayed and denied claims.

In sum, the Amended Complaint alleged a false representation to Trinity in the Management Agreement, scienter by Aliera and the Aliera Insiders because the promise to fund the claims account was false, intent to induce Trinity into entering the agreement, justifiable reliance by Thead and Trinity in entering the agreement, and damage to Trinity.

Further, the Court finds that the Sharity Trustee has met the Rule 9(b) particularity requirement by including "allegations of [the] date" of the purported fraud and interactions relevant thereto, including the date that the Management Agreement was executed and references to communications between Defendant and the Aliera Insiders. Defendant has therefore been sufficiently put on notice of the alleged fraud in question in this action. Thus, the Sharity Trustee has adequately alleged an underlying fraud committed against Trinity by Aliera and the Aliera Insiders. The Court now turns to whether the Sharity Trustee has sufficiently pled that Defendant had knowledge of and substantially assisted this alleged fraud. [54]

### ii.  The Knowledge Element

To adequately plead knowledge, a plaintiff must allege "'factual content that allows the court to draw the reasonable inference' that a defendant knew" about the underlying tort. *Otto Candies, LLC v. Citigroup, Inc.*, 137 F.4th 1158, 1180 (11th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678). Knowledge may be inferred by evaluating the totality of the circumstances alleged in the complaint. *See United States v. Santos,*

---

[54] However, the provision of banking services by Defendant is unrelated to the misrepresentations about the plans made by Aleira and Sharity to the Consumer Members and those banking services cannot be said to have substantially assisted Aliera and Sharity in making those misrepresentations.

553 U.S. 507, 521 (2008) ("[Knowledge] will be provable (as knowledge must almost always be proved) by circumstantial evidence."); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1296 (M.D. Fla. 2018); *Cabot E. Broward 2 LLC v. Cabot*, No. 16-61218-CIV, 2016 WL 8739579, at *4 (S.D. Fla. Oct. 25, 2016) ("[A]ctual knowledge of another's wrongful conduct is nearly universally found based upon circumstantial evidence.").

Before delving into what constitutes knowledge for purposes of the Court's inquiry, we have to understand how bank liability works in this context. As a general proposition, a bank has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds. *See Tattnall Bank v. Harvey*, 198 S.E. 724, 725–26 (Ga. 1938) (establishing the general policy that banks may presume that an authorized signatory is permitted to transfer money in and out of an account); *see also* O.C.G.A. § 11-4-406(c) (placing the duty to monitor and report unauthorized bank account transfers on the account holder rather than the bank).

The level of knowledge required to sustain a claim for fraud against an accomplice is actual knowledge; constructive knowledge[55] does not cut it. *See, e.g.*, *Siavage*, 829 S.E.2d at 790–91 (to sustain a fraud claim against an accomplice, "actual knowledge" is required); *see also El Camino Res., LTD.*, 722 F. Supp. 2d at 905–08 (collecting cases across multiple jurisdictions wherein courts have required "that a

---

[55] While actual knowledge exists where a defendant knows of the underlying tort, one has constructive knowledge when they *should have known* about the tortious conduct but in fact did not. *See El Camino Res., LTD. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 906 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013).

plaintiff prove [that the accomplice defendant have] actual knowledge of the principal wrong").

To that end, numerous courts have found that pleading that a bank knew of and ignored "red flags" is not sufficient to show that the bank had actual knowledge of the fraud scheme.  *See, e.g., B-Smith Enters., LP v. Bank of Am., N.A.*, No. 22-11383, 2023 WL 2034419, at *2 (11th Cir. Feb. 16, 2023) ("In the context of an aiding-and-abetting claim asserted against a bank, the 'knowledge' element requires a showing that the bank had actual knowledge of the alleged wrongdoing." (citing *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014))).[56]  Generally, actual knowledge may not be inferred where the allegations show merely that the bank's internal monitoring systems alerted the bank to potential fraud on the account.  *Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-CIV-21771, 2017 WL 5514370, at *4 (S.D. Fla. Nov. 15, 2017) ("[E]ven if [the bank] detected suspicious activity on the accounts as alleged, this only demonstrates knowledge of the symptoms of the Ponzi scheme, not JPMC's actual knowledge of the scheme itself.") (hereinafter "*Isaiah II*").  For example, in *Isaiah II*, the court found that the trustee failed to plead that a bank had actual knowledge of the debtor's Ponzi scheme, despite allegations that the bank detected suspicious activity on the account and failed to adhere to certain banking rules and regulations, and withdrawal slips indicated that there was fraud on the account.  2017 WL 5514370, at *3–4.

---

[56] This case was decided under Florida law.  *See id*.

So, something more than mere warning signs is needed to show that a bank had knowledge of fraud. But what is required? One case where the plaintiffs overcame this hurdle is *In re TelexFree Secs. Litig.*, 626 F. Supp. 3d 253 (D. Mass. 2022). There, the court found that the complaint created a strong inference of the bank's actual knowledge of its customer's illegal pyramid scheme where the bank not only closed the principal's account for suspicious activity, but also openly expressed concern to the principal about the illegality of the scheme. *Id*. at 272. Likewise, the *TelexFree* court inferred actual knowledge from another bank's "reactions to the red flags: namely, discussions between [the bank] and [the primary wrongdoer] concerning the scheme's negative publicity and shutdown in Brazil." *Id*. at 276. However, the court found that a third bank defendant was not pled to have had actual knowledge because "[t]he allegations [relating to that bank] concern[ed] only red flags," rather than alleging "how [that bank] processed or responded to the red flags." *Id*. at 275.

Thus, when only so-called red flags about a depositor's conduct are known to a bank, courts would generally not infer that a bank had actual knowledge of the primary wrongdoer's tortious conduct, but an inference is permissible where the circumstances show that either the bank employee had intimate knowledge of the customer's banking activities or the bank acknowledged its customer's or customer's authorized agents' fraud. *Compare id*. at 272, 275–76, *with Isaiah II*, 2017 WL 5514370, at *4.

81

Here, the circumstantial allegations create a plausible inference that Defendant had knowledge of the fraud committed by Aliera against Trinity through the Management Agreement.  Specifically, Defendant saw on Aliera's unaudited financial statement that Aliera collected approximately $2.4 million in revenues in the first two months of 2017 but only paid out about $12,000 in medical expenses— just half a percent of its revenues.  The following year, Owens was informed that the Aliera Insiders comingled Unity's funds with other Aliera funds and stole $150,000 of Unity funds that were previously in Aliera's possession.  After receiving word of the Aliera Insiders' misappropriation of Unity's assets, Defendant froze the Unity accounts four days later.  Otherwise, Owens and Defendant carried on their relationship with the Aliera Insiders.  At this point, the Court can infer that Defendant knew that the Aliera Insiders engaged in some questionable business practices, but nothing more at that point in time.

After the Unity and Aliera relationship collapsed, Defendant opened accounts for Trinity in September of 2018.  It is surely plausible that Defendant knew the Aliera Insiders did not fund the Trinity claims account for multiple months after being opened, because Defendant allegedly sent a notice to Aliera in December of 2018 that the Trinity accounts would be closed due to lack of funding.  At that point, the Court can plausibly infer that Defendant had knowledge of Aliera's fraud in inducing Trinity into entering the Management Agreement.  Those accounts were eventually closed and reopened with a nominal deposit several months into 2019.  Later, in March of 2019, the Aliera Insiders openly told Defendant about large

82

transfers from the Aliera accounts that again were not going to Trinity.  *See* (Am. Compl. ¶ 77, ECF No. 24).   Defendant's knowledge about Aliera and the Aliera Insiders' (a) commingling and misappropriation of Unity's funds, (b) lack of funding for medical claims in early 2017, (c) failure to fund Trinity for several months resulting in closure of Trinity's accounts at Wells Fargo, and (d) the Aliera Insiders' diversion of Aliera's assets for purposes other than funding Trinity, together suffice to create a plausible inference that Defendant knew that Aliera and the Aliera Insiders were defrauding Trinity by failing to fund its accounts for the payment of medical claims.

Accordingly, the well-pleaded facts are sufficient to establish Defendant's knowledge of Aliera's fraud against Trinity through Aliera's failure and lack of intent to perform its duties under the Management Agreement.

### iii.   The Substantial Assistance Element

In Georgia, a defendant is liable for fraud when he renders "substantial aid, or . . . substantial assistance" to the primary wrongdoer's underlying tort, such that the defendant's conduct was "a substantial factor in the resulting tort by [the] third person tortfeasor." *Peterson*, 108 F. Supp. 3d at 1357 (quoting *Madden*, 115 S.E.2d at 409); *see also Siavage*, 829 S.E.2d at 790 n.13 (citing *ZP No. 54 Ltd. Partnership v. Fidelity & Deposit Co. of Md.*, 917 So.2d 368, 372 (Fla. App. 2005) for the proposition that "[v]irtually all courts that have acknowledged the existence of aiding and abetting a fraud state that the following are the elements that must be established by the plaintiff: 1. There existed an underlying fraud; 2. The defendant had

knowledge of the fraud; 3. The defendant provided substantial assistance to advance the commission of the fraud."). To show substantial assistance, or "participation," in perpetrating the principal's tort, "'the plaintiff [must] show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort.'" *Aetna Cas. & Sur. Co. v. Leahey Const. Co.,* 219 F.3d 519, 537 (6th Cir. 2000) (quoting *K & S P'ship v. Continental Bank, N.A.,* 952 F.2d 971, 979 (8th Cir. 1991)).

Whether a bank *substantially* assisted the principal depends on its knowledge of the principal's underlying tort. Thus, although "[t]he provision of routine banking services typically does not constitute substantial assistance," the bank may be liable if it "has actual knowledge that its routine services are assisting a customer in committing a specific tort." *In re TelexFree Sec. Litig.,* 626 F. Supp. 3d at 272 (citing *In re Agape Litig.,* 681 F. Supp. 2d 352, 365 (E.D.N.Y. 2010) (applying New York law)); *see also Otto Candies, LLC v. Citigroup Inc.,* 137 F.4th at 1179 (applying Florida law); *Henry v. Lehman Comm. Paper, Inc. (In re First All. Mortg. Co.),* 471 F.3d 977, 995 (9th Cir. 2006) (applying California law to hold that "ordinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort. Knowledge is the crucial element." (internal quotations and citation omitted)); *Fatnani v. JPMorgan Chase Bank, N.A.,* 743 F. Supp. 3d 1253, 1283–84 (D. Or. 2024) (applying Oregon law); *Mansor v. JPMorgan Chase Bank, N.A.,* 183 F. Supp. 3d 250, 264 (D. Mass. 2016)

(applying Massachusetts law); *El Camino Resources, LTD*, 722 F. Supp. 2d at 907 (W.D. Mich. 2010) (applying Michigan law);; *In re Section 1031 Exch. Litig.*, 716 F. Supp. 2d 415, 424 (D.S.C. 2010) (applying Virginia law); *In re J&J Inv. Litig.*, No. 222CV00529GMNNJK, 2023 WL 2572300, at *4–5 (D. Nev. Mar. 18, 2023) (applying Nevada law); *Villalobos v. Deutsche Bank Nat'l Tr. Co.*, No. C09-1450-JCC, 2011 WL 13232599, at *4 (W.D. Wash. May 3, 2011) (applying Washington law).[57]   Thus, allegations supporting a plausible inference that the defendant knowingly enabled a perpetrator to carry out a fraud or embezzlement scheme suffice to establish substantial assistance at the pleading stage.   *See In re TelexFree Sec. Litig.*, 626 F. Supp. 3d at 273.

The Court previously found that the Amended Complaint adequately alleged that Defendant had knowledge of Aliera and the Aliera Insiders' underlying fraud against Trinity by December of 2018 when Defendant gave Aliera a notice of termination of the unfunded Trinity accounts.[58]   With that knowledge, Defendant continued to provide its banking services to Aliera.   Those services were allegedly used to divert monies away from Aliera and Sharity to the Aliera Insiders for their personal use and benefit, as well as to pay the exorbitant commissions that Aliera promised brokers to sell their phony HCSM plans.

---

[57] Based on the Court's research into this issue, because Georgia law does not have any authority that contradicts this premise and the majority of jurisdictions that have addressed this issue abide by the above rule, the Court finds that Georgia courts would likely adopt this rule. *See GSR Markets Ltd.*, 2024 WL 3311315, at *2 ("[W]e 'presume that [Georgia] courts would adopt the majority view on a legal issue in the absence of indications to the contrary.' *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London,* 32 F.4th 1347, 1358 (11th Cir. 2022)").

[58] Defendant reopened the Trinity accounts after Aliera put a nominal deposit in those accounts "well into 2019." (Am. Compl. ¶ 75, ECF No. 24).

Based on these allegations, which include particular dates and references to communications between Aliera, the Aliera Insiders, and Defendant relevant to the alleged fraud and Defendant's knowing and substantial assistance thereto, the Court concludes that the Sharity Trustee has sufficiently pled a fraud claim under Georgia law and the Fed. R. Civ. P. 9(b) pleading standard. Accordingly, Defendant's request to dismiss Count V with respect to the Sharity Trustee is denied.

### 2. Aiding and Abetting Breach of Fiduciary Duty

In Count VII of the Amended Complaint, the Aliera Trustee alleges that Defendant aided and abetted the Aliera Insiders' breaches of fiduciary duty to Aliera.[59]

To state a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege:

> (1) through improper action or wrongful conduct . . . , the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff;
> (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure;
> (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and
> (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Tech., Inc.*, 633 S.E.2d at 379 (footnotes omitted). For this claim to stand, there must have been an underlying breach of fiduciary duty between the "primary

---

[59] The Sharity Trustee brought an aiding and abetting breach of fiduciary claim as well, but the Court dispensed with that claim above because the Sharity Trustee lacked standing to bring it.

wrongdoer" and the plaintiff. *Id.*; *see also TMX Fin., LLC v. Goldsmith*, 833 S.E.2d 317, 336 (Ga. Ct. App. 2019).

### a. The Aliera Insiders' Breaches of Fiduciary Duty

First, the Court must apply Delaware law, by and through Georgia's internal affairs doctrine, to determine if the Aliera Trustee has sufficiently alleged an underlying breach of fiduciary duty by Aliera's directors and officers. O.C.G.A. § 14-2-1505(c).[60] To state a claim for breach of fiduciary duty, a plaintiff must allege "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). Corporate directors and officers owe fiduciary duties of loyalty, due care, and good faith to the corporation. *See Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009); *Emerald Partners v. Berlin*,

---

[60] *See Diedrich v. Miller & Meier & Assocs., Architects & Planners, Inc.*, 334 S.E.2d 308, 310 (Ga. 1985), (holding that "the wrongful appropriation of a business opportunity of a foreign corporation by its officer or director is an internal affair not to be regulated by Georgia law" because "the internal affairs doctrine [applies] 'whenever the issue concerns the relations inter se of the corporation, its shareholders, directors, officers or agents.' Restatement (Second) Conflicts of Laws § 313."). In *In re Friedman's (I)*, Judge Edenfield found that the "internal affairs doctrine as applied by Georgia courts requires that the law of the state of incorporation [i.e., Delaware] apply to the claims before this Court alleging breach of fiduciary duties by [the debtor's insiders]," 385 B.R. at 432–33. Later in the same order, the court applied Georgia law to a claim for aiding and abetting the aforementioned breach of fiduciary duty. *Id.* at 438–39. However, in assessing the aiding and abetting claim, Judge Edenfield remained steadfast that the actual fiduciary duties and breach thereof were still governed by Delaware law pursuant to Georgia's internal affairs doctrine. *See id.* at 438–39 ("Because the third element [of the Georgia aiding and abetting breach of fiduciary duty claim] requires an actual breach of fiduciary duty by the primary wrongdoer, the Court only need consider the aiding and abetting claim with respect to the breach of loyalty claims that were sufficiently pled [under Delaware law]."); *see also Kennedy v. Stein*, No. 5:21-CV-00106-TES, 2021 WL 4509167 at *7 (M.D. Ga. Oct. 1, 2021) ("Under Georgia law, breach of fiduciary duty claims fall within the internal affairs doctrine and are thus governed by the state of incorporation.").

To summarize, the aiding and abetting claim is still wholly governed by Georgia law; Georgia law just adopts the law of the state of incorporation through the internal affairs doctrine to determine whether the corporation's officers and directors breached a fiduciary duty to the corporation. So, for our purposes, Georgia law determines the elements of the aiding and abetting breach of fiduciary duty claim, but Delaware law determines whether the underlying breach took place.

787 A.2d 85, 90 (Del. 2001). The duty of good faith may be breached by either "subjective bad faith," "gross negligence . . . without any malevolent intent," or "a conscious disregard for one's responsibilities." *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 64–66 (Del. 2006). Meanwhile a director or officer violates the duty of loyalty when he fails to maintain "an undivided and unselfish loyalty to the corporation" such that his actions create a "conflict between [his] duty and self-interest." *United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1050 (Del. 2021) (internal quotations and citation omitted). As discussed above, these duties to the corporation persist even when the corporation is insolvent. *N. Am. Cath. Educ. Programming Found., Inc.*, 930 A.2d 92.

Here, the Aliera Trustee sufficiently alleged that Aliera's directors and officers owed fiduciary duties to Aliera by the nature of their positions within the corporation. Next, the Aliera Trustee has met its burden of alleging a breach of the fiduciary duties of good faith and loyalty by pleading that the Aliera Insiders took more than half of all of Aliera's funds for themselves, leaving the company insolvent. The Aliera Trustee pointed to deliberate actions by Aliera's Insiders to create a fraudulent HCSM scheme whereby the Aliera Insiders allegedly looted the company for their own personal benefit and that of Defendant. Additionally, the Aliera Trustee has sufficiently alleged that Aliera's Insiders breached their duties to Aliera through their mishandling of Aliera's assets and misrepresentations about the HSCM plans. The pleadings thus show that rather than act in the best  interest of Aliera, the Aliera Insiders acted in subjective bad faith towards the company and put their own self-

interest above all else.  The Aliera Insiders personally derived a financial benefit at the expense of Aliera, causing it to incur liabilities and other expenses it could not pay.  Finding that the allegations sufficiently establish an underlying breach of fiduciary duty, the Court now turns to whether the Amended Complaint sufficiently alleges how Defendant's actions aided and abetted that breach of fiduciary duty.

### b. Defendant's Knowledge of the Aliera Insiders' Duties

Turning back to Georgia law to determine whether the Aliera Trustee has adequately alleged that Defendant aided and abetted that breach, the Court first looks to whether Defendant had knowledge of the Aliera Insiders' fiduciary duties.  As a national bank that provides extensive business services to a wide range of clients, it is surely plausible that Defendant knew that the Aliera Insiders, as directors and officers, owed fiduciary duties to act with loyalty, due care, and good faith towards Aliera.

### c. The Procurement Element

Next, the Court turns to the procurement element.  In this Court's Order in *Aliera LT, LLC v. Health Reform Team, Inc. (In re Aliera Cos., Inc.)*, it determined that "[a] defendant can procure a breach of fiduciary duty by either 'lending assistance in the actual perpetration of the wrong done by another' or successfully causing such breach 'through advice, counsel, persuasion, or command.'"  665 B.R. 468, 516 (Bankr. N.D. Ga. 2024) (quoting *TMX Fin., LLC*, 833 S.E.2d at 336 (internal quotations and citation omitted)).  The Trustees assert this position.  By contrast, Defendant argues that lending assistance is insufficient to establish such a claim;

only successfully causing a breach by "advice, counsel, persuasion, or command" is sufficient. *See GSR Markets Ltd. v. McDonald*, 593 F. Supp. 3d 1208, 1232 (N.D. Ga. 2022) (finding that the plaintiff failed to state an aiding and abetting breach of fiduciary duty claim where the plaintiff did not allege that the defendant gave advice, counsel, persuasion, or command" to procure the breach); *Bass v. Regions Bank, Inc.*, No. 1:17-CV-00309-LMM, 2021 WL 9771804, at *8 (N.D. Ga. Jan. 11, 2021) (same). After thorough review of this issue, for the reasons set forth below, this Court's original approach to this issue was the correct one, and as a result the Aliera Trustee has plausibly pled this element of the claim.

As the Court mentioned above, a claim for aiding and abetting breach of fiduciary duty combines the common law breach of fiduciary duty tort with the statutory theory of accomplice liability under O.C.G.A. § 51-12-30. *See Insight Tech., Inc.*, 633 S.E.2d at 378–79. Some courts have relied on language in *Insight Tech, Inc.*, and *TMX Fin., LLC*, as support for Defendant's position. In *Insight Tech.*, the Georgia Court of Appeals noted that the "word 'procure' . . . does not require the lending of assistance" to the underlying tort, but procurement may be established by showing that the primary wrongdoer acted "through advice, counsel, persuasion, or command." *Id.* at 379 n.12 (quoting *Melton v. Helms*, 62 S.E.2d 663, 665 (Ga. Ct. App. 1950)). Additionally, in *TMX Fin., LLC*, the Georgia Court of Appeals found that "*[e]ven where* the defendant does not 'lend assistance in the actual perpetration of the wrong done by another,' he 'procures' a breach of fiduciary duty where he succeeds in causing another person to breach his fiduciary duty 'through advice, counsel,

persuasion, or command.'" 833 S.E.2d at 336 (emphasis added) (quoting *White v. Shamrock Bldg. Systems*, 669 S.E.2d 168, 176 n.23 (Ga. Ct. App. 2008), *overruled on other grounds*, *Pollard v. Great Dane, LLC*, 903 S.E.2d 338 (Ga. Ct. App. 2024)).

Courts that may appear to support the Defendant's position read the language in *Insight Tech* and *TMX* to be limiting—that the lending of assistance does not suffice to establish the procurement prong of the claim.  Under this view, the only way to aid and abet one's breach of fiduciary duty is to solicit or encourage the breach. But any such conclusion is wrong because it is based on an incomplete reading of those two cases and the cases on which they rely.

This Court reads those cases as being inclusive—allowing the "procurement" element to be pled by alleging that the defendant either lent assistance or induced the breach of the fiduciary duty.  In other words, there is an upper and lower threshold of acts that amount to procurement of the wrongful act.  To rephrase from *TMX Fin., LLC*, even if the defendant did not assist the principal's commission of the tort, he may still be liable where he merely encourages the commission of that tort. Thus, although knowing and substantial assistance will establish the tort, mere inducement is sufficient as well.

In *White*, a case relied on by *TMX Fin., LLC*, the Georgia Court of Appeals recognized that "'one who procures *or assists* in the commission of an actionable wrong is equally liable with the actual perpetrator for the damages.'" 669 S.E.2d at 176 (quoting *City of Hawkinsville v. Wilson & Wilson, Inc.*, 200 S.E.2d 262, 264 (Ga. 1973) to explain that a showing of assistance suffices to establish the procurement

prong).   At the summary judgment stage, *White* allowed an aiding and abetting breach of fiduciary duty claim to survive where there were questions of fact as to whether the defendant corporation "assisted in [its sole shareholder's] alleged tortious conduct." *Id*.   And again in *TMX Fin., LLC*, the plaintiff stated a claim against a group of defendants for aiding and abetting breach of fiduciary where those defendants allegedly "acted to assist" the primary wrongdoer's hostile takeover and dismantling of the plaintiff's company "by learning [the company's] operations under false pretenses of conducting an inspection of the books . . . and then by actually running the company once [the primary wrongdoer] wrongfully ousted the plaintiffs from control." 833 S.E.2d at 336 (finding that the allegations in the complaint satisfied the notice pleading standard for an aiding and abetting breach of fiduciary duty claim).   Further, *TMX Fin., LLC*,  found that sufficient allegations existed to show that defendant entities, which were owned by the primary wrongdoer, aided and abetted in a scheme to take over the plaintiff's business and sell it for an unreasonably low price.  *Id*. at 322–326.   But the allegations discussed by that court do not purport to show any acts by those entities to *induce* the primary wrongdoer into acting.   *See id*.   Rather, the allegations showed that those defendant entities "were acting at the personal behest of [the primary wrongdoer]." *Id*. at 333, 336. Specifically, those defendants "acted to assist" the primary wrongdoer's hostile takeover and dismantling of the plaintiff's company "by learning [the company's] operations under false pretenses of conducting an inspection of the books . . . and then by actually running the company once [the primary wrongdoer] wrongfully ousted the

92

plaintiffs from control." *Id.* at 336. This further shows that allegations that the defendant *assisted* the wrongdoer satisfy the so-called "procurement" prong of accomplice liability in Georgia.[61]

This is all to say a defendant can procure a breach of fiduciary duty by either "lend[ing] assistance in the actual perpetration of the wrong done by another" *or* by successfully causing such breach "through advice, counsel, persuasion, or command." *See, e.g., TMX Fin., LLC*, 833 S.E.2d at 336 (internal quotations and citation omitted).

In the instant case, the allegations create a plausible inference that Defendant did lend assistance "in the actual perpetration of the wrong done by" the Aliera Insiders by providing essential banking services to their scheme. As discussed above, Aliera was allegedly financially injured by the Aliera Insiders' theft of corporate funds from Aliera's Mother Account at Wells Fargo, using a web of additional Aliera Insider-controlled accounts that were opened with Defendant. The Aliera Insiders used bank accounts as the conduit to bring funds into Aliera, which were then commingled with other revenue streams and wrongfully diverted out of Aliera for the Aliera Insiders' personal benefit and use.

---

[61] Additionally, in *Melton v. Helms*, the case that *Insight Tech* relied on when defining the word "procure," the court dealt with a claim for aiding and abetting trespass to land brought under what is now O.C.G.A. § 51-12-30. *Melton*, 62 S.E.2d 663. *Melton* noted that "[o]ne who procures *or assists* in the commission of [the underlying tort] is equally liable with the actual perpetrator." *Id.* at 665 (emphasis added). The court further elaborated that an "action may be maintained, not only against the party who did the act, but against all who *direct* or *assist* in the commission of it." *Id.* (emphasis in original). This clearly shows that § 51-12-30 can be pled by showing either assistance *or* "advice, counsel, persuasion, or command." *Id.* Additionally, O.C.G.A. § 51-12-30 was cited by the *Siavage* court to support its holding that a party who "knowingly participates in a fraud may be held liable for fraud." 829 S.E.2d at 790, 790 n.11.

Although the alleged assistance lent by Defendant was not as extensive as the defendants in *TMX Fin., LLC*, who went to the extent of learning and running the plaintiff's business as part of the hostile takeover, the use of bank accounts at Wells Fargo allegedly assisted the process for the Aliera Insiders' scheme to collect and loot funds from Aliera. Without access to banking services, money could neither have been brought into or taken from Aliera. As such, the Court finds that the Amended Complaint did adequately establish the "procurement" prong of the aiding and abetting breach of fiduciary duty tort. Next, the Court turns to a related prong of the aiding and abetting breach of fiduciary duty test: assessing whether the Amended Complaint alleges that Defendant engaged in wrongful conduct.

### d. *Improper Actions or Wrongful Conduct*

Improper actions or wrongful conduct constitute "conduct wrongful in itself." *White*, 669 S.E.2d at 172. While usually this type of conduct "involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions," that is not necessarily a hard and fast rule. *Id.* at 172–73. This subcomponent to the substantial assistance element is seemingly redundant. Georgia courts have only addressed it in the aiding and abetting context in *White*, 669 S.E.2d at 173. In that case, a contractor represented to the defendants that he was free to pursue projects independent of the plaintiff company he worked for, when he in fact was not. *Id.* at 173. Because the evidence showed that the defendants thought the contractor was free to solicit his own independent clients, the court found

that the defendants did not engage in improper action or wrongful conduct. *Id.* at 173. And although the wrongful conduct element was not addressed in *TMX Fin., LLC*, that court did note that the defendant "learn[ed] [the plaintiff's entity's] operations under the *false pretense* of conducting an inspection of the books so as to facilitate a smooth takeover of the company." 833 S.E.2d at 336. Thus, the implied wrongful conduct of fraud or misrepresentation was apparent within those allegations.

However, other cases dealing with aiding and abetting breach of fiduciary duty claims were barren of any allegations or evidence that the defendant used the above-mentioned predatory tactics to "procure[] a breach of the primary wrongdoer's fiduciary duty." *See Insight Tech., Inc.*, 633 S.E.2d at 379. That case merely indicated that knowing inducement or assistance in the underlying breach of fiduciary duty may, in itself, constitute wrongful conduct. For example, wrongful conduct has been inferred where the defendant convinced the principal to create and run a freight factoring company that was in direct competition with the plaintiff, while the principal was still employed by the plaintiff. *See id.* at 375–77, 379.

So, on the one hand, we have *White*, where the defendants lack of knowledge of the primary wrongdoer's tortious conduct resulted in summary judgment in favor of the defendant. We also have *TM Fin., LLC*, which provided a clearcut example of wrongful conduct through the use of fraud or misrepresentation. By contrast, we have *Insight Tech., Inc.*, where there were no apparent allegations of predatory tactics

used to assist or induce the breach of fiduciary duty.[62] Rather, *Insight Tech, Inc.*, implies that a defendant's mere knowledge that he is assisting or inducing a breach of the primary wrongdoer's fiduciary duty constitutes wrongful conduct. In other words, knowledge is the gateway to liability for assisting the principal's tortious conduct, such that knowingly assisting in the primary wrongdoer's tortious conduct is "wrongful in itself." *See White*, 669 S.E.2d at 172.

Here, the Court finds it plausible that Defendant knew about the Aliera Insiders' breaches of their fiduciary duties after Defendant allegedly learned that the Aliera Insiders commingled Aliera and Unity funds, stole $150,000 in Unity funds and were causing Aliera to completely withhold funds from Trinity's accounts for several months. *See* (Am. Compl. ¶ 75, ECF No. 24). Moreover, as the Court discussed above with respect to the Sharity Trustee's fraud claim, Defendant allegedly knew that the Aliera Insiders were causing Aliera (a) to defraud one of its creditors, Trinity, for the payment of medical claims; and (b) to divert large amounts of money to the Aliera Insiders for their personal use and benefit.

With this knowledge that the Aliera Insiders had stolen money from Unity and were causing Aliera to fail in its primary business purpose—to disburse funds for

---

[62] Although the complaint in *Insight Tech, Inc.*, indicates that the defendant convinced the principal to form a new factoring company, resulting in a breach of the principal's fiduciary duty to his current employer, a different factoring company, there were no allegations that the defendant accomplished this by employing "predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *See White*, 669 S.E.2d at 172–73. Rather, the defendant and principal in *Insight Tech, Inc.*, merely "began to discuss starting a new internet factoring business together" and eventually did so. 633 S.E.2d at 376. Thus, although the primary wrongdoer in that case may have been induced into acting, it was not through predatory tactics like those listed above.

payment of medical claims—the Court can plausibly infer that Defendant knew the Aliera Insiders were breaching their fiduciary duties to Aliera. Thus, the Court finds that the Aliera Trustee has alleged well-pleaded facts sufficient to support a plausible inference that Defendant engaged in wrongful conduct in the context of the aiding and abetting breach of fiduciary duty claim. The Court now moves onto the malice and intent to injure element of the claim.

### e. Malice and Intent to Injure

To state a claim for aiding and abetting breach of fiduciary under Georgia law, the plaintiff must also allege, *inter alia*, that the defendant "acted purposely and with malice and the intent to injure." *Insight Tech., Inc.*, 633 S.E.2d at 379 (footnotes omitted).

An act is "malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith." *Insight Tech., Inc.*, 633 S.E.2d at 379 n.13. Thus, maliciousness includes "any unauthorized interference, or any interference without legal justification or excuse. Personal ill will or animosity is not essential." *Id.* For example, "persuading someone to break a contract for one's own benefit at the expense of another may be malicious and actionable." *White*, 669 S.E.2d at 173. However, in the tort context a defendant acts with intent to injure where he had "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." *Sun Nurseries, Inc. v. Lake Erma,*

*LLC*, 730 S.E.2d 556, 563 (Ga. Ct. App. 2012) (quoting *Valades v. Uslu*, 689 S.E.2d 338, 343 (Ga. Ct. App. 2009)).

Here, although the Court plausibly inferred above that Defendant knew the Aliera Insiders were misappropriating Aliera funds for their personal use rather than disbursing the funds for payment of medical claims, the Amended Complaint does not show that Defendant intended to injure Aliera. Rather, Defendant allegedly provided routine banking services to Aliera and the Aliera Insiders, as well as their owned, controlled, and affiliated entities both *before and after* obtaining knowledge of the Aliera Insiders' wrongdoing. Because nothing else in the Amended Complaint ascribes Defendant's intent, the Court finds that even read in the light most favorable to the Aliera Trustee, the allegations show, at most, that Defendant's provision of routine banking services was incidental to the looting, not something Defendant intended to occur. In other words, the Amended Complaint does not allege facts displaying that Defendant "actual[ly] inten[ded] to cause harm to [Aliera]," but instead only showed that Defendant "merely . . . inten[ded] to do the act purportedly

resulting in the claimed injury," by opening and maintaining bank accounts for Aliera and the Aliera Insiders. *See id.*[63]

Because the Aliera Trustee has not adequately pled that Defendant had an intent to injure Aliera, the Court concludes that the Aliera Trustee has not stated a claim for aiding and abetting breach of fiduciary duty under Georgia law. As such, that claim must be dismissed.

### C. The Trustees' Conspiracy Claims

The Trustees also respectively allege two conspiracy claims related to the torts discussed above: Count VI for conspiracy to commit fraud and Count VIII for conspiracy to aid and abet the Aliera Insiders' breaches of fiduciary duties. None of these claims survive the Motion.

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Jenkins*, 711 S.E.2d at 85 (citation omitted). A conspiracy claim cannot survive if the plaintiff has not adequately pled the existence of the underlying tort. *See, e.g., id.* ("Absent the

---

[63] In *Health Reform Team,* and other related cases, the Court dealt with an aiding and abetting breach of fiduciary duty claim brought by the Aliera Trustee against a broker hired by Aliera to sell the fraudulent HCSM plans for an allegedly exorbitant commission far in excess of the industry standard rate. 665 B.R. 468 (Bankr. N.D. Ga. 2024). In those cases, this Court found a plausible inference of malice and intent to injure. *See id.* at 516–17. Unlike the instant case, the allegations in in *Health Reform Team* created a plausible inference that the defendant, along with the other broker defendants, had obtained knowledge of the Aliera Insiders' breaches of fiduciary duty from the outset of their business relationship. The Court found that a plausible inference of malice and intent to injure existed in those cases because of the allegations that the broker defendants (a) agreed to a commission rate that "was allegedly at least three times higher than the industry standard commission," (b) premised their business relationship "upon the Defendant and Aliera's Insiders taking funds from Aliera that should have been allocated to pay Aliera's liabilities"; and (c) knowing these HCSM products were fraudulent, agreed to directly sell them to the public, causing Aliera to accrue millions of dollars in liabilities from each sale. *See id.* By contrast, the Defendant here obtained knowledge later on and merely continued its course of conduct of providing otherwise routine banking services to the Aliera Insiders without regard for what the Aliera Insiders did with their business and personal use accounts.

underlying tort, there can be no liability for civil conspiracy."); *Premier/Georgia Mgmt. Co. v. Realty Mgmt. Corp.*, 613 S.E.2d 112, 118 (Ga. Ct. App. 2005) (finding that "because the underlying tort claim fails, [the plaintiff] cannot maintain a cause of action for conspiracy to breach a fiduciary duty."); *Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455, 461 (Ga. Ct. App. 2002) (in a case against a bank, finding that "because [the plaintiff's] underlying fraud claim fails, he cannot maintain a cause of action for conspiracy to defraud him.").

Therefore, because neither of the Trustees stated a claim for aiding and abetting breach of fiduciary duty under Count VII, the related conspiracy claim to that Count must likewise be dismissed with respect to both Trustees. Also, because the Aliera Trustee failed to state a claim for fraud under Count V, its corresponding Count VI conspiracy claim must be dismissed on the same grounds.

All that remains to be addressed in this section is the Sharity Trustee's conspiracy to commit fraud claim. Unfortunately for the Sharity Trustee, this cause of action does not pass muster in the Court's Rule 12(b)(6) analysis.

The "'essential element of the alleged conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design.'" *Peterson v. Aaron's, Inc.*, 108 F. Supp. 3d at 1356 (quoting *McIntee v. Deramus*, 722 S.E.2d 377, 379 (Ga. Ct. App. 2012)). That is, "'there can be no conspiracy without a purpose, express or implied, to do something unlawful, oppressive, or immoral.'" *Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*, 508 F. Supp.

100

3d 1303, 1314 (N.D. Ga. 2020)  (quoting *R.R.R. Ltd. P'ship v. Investguard, Ltd. et al.,*
463 S.E.2d 735, 736 (Ga. Ct. App. 1995)).  In alleging a conspiracy, the plaintiff must
allege facts sufficient to demonstrate "*how* [the defendant] arrived at such a mutual
understanding." *Id.* at 1313 (emphasis in original).

Here, Defendant allegedly provided routine banking services[64] to Aliera from
June of 2015 until March of 2020.  For the first three years of that banking
relationship, the allegations in the Amended Complaint do not support a plausible
inference that Defendant knew that Aliera was engaged in a fraudulent or unlawful
business.  Defendant allegedly learned that Moses misappropriated Unity funds from
the Unity accounts and froze the Aliera Insiders' access to those accounts four days
later.  But Defendant otherwise continued its banking relationship with Aliera and
the Aliera Insiders' entities—business as usual.[65]

Then, the Aliera Insiders created and opened four bank accounts for Trinity in
September of 2018.[66]  As discussed above, the Court can plausibly infer that
Defendant acquired actual knowledge in no later than December of 2018 that Aliera
and the Aliera Insiders were not funding Trinity whatsoever based on Defendant's

---

[64]  The Aliera Insiders used Defendants services to open bank accounts, and to collect and transfer
money using those accounts.
[65] To be clear, Moses's misappropriation of approximately $150,000 in Unity funds does not appear to
create liability for Defendant because a bank is **not** liable under Georgia law "where an agent or
fiduciary misappropriates funds of the owner in breach of his agency or trust without the bank's
knowledge." *GSR Markets Ltd.*, 593 F. Supp. 3d at 1228.  Defendant's knowledge of that incident was
allegedly after-acquired, thus negating its liability for the misappropriated $150,000.
[66] The Sharity Trustee alleged that no Trinity employees had access to the Trinity accounts.

notice of termination of the unfunded Trinity accounts.[67]   Thereafter, Defendant continued to provide the same routine banking services to Aliera and the Aliera Insiders' other entities that it provided *before* acquiring such knowledge—opening accounts and honoring transfers into and out of those accounts.

The timeline of events is as follows: Defendant learned in December of 2018 that Aliera was not funding Trinity's accounts and closed those accounts.  The Trinity accounts were not reopened until "well into 2019" with a deposit into the accounts. Throughout that time, Defendant kept the accounts for Aliera and the Aliera Insiders' entities open and functional, just as it did prior to learning about Aliera's failure to fund Trinity.[68]  The only affirmative actions that Defendant allegedly took thereafter were twofold: opening accounts for Aliera's Subsidiaries in late 2019[69] and

---

[67] Moses's looting of Unity funds does not give rise to actual knowledge of fraud against Trinity because (1) Sharity Trustee can only sue for injuries to Sharity itself rather than the entire fraud scheme as a whole, (2) the Unity matter was contested, (3) Trinity had not been formed at the time the Unity relationship was terminated and (4) knowledge that an insider misappropriated money from an affiliate or subsidiary through an excessive or unauthorized distribution does not equate to actual knowledge that the insider or his company is committing fraud against a different affiliated entity.

[68] Although it is not alleged that Defendant monitored every transfer from the Mother Account to ensure sufficient funds went to Trinity, as the Court discusses below, Defendant had no duty to do so because banks generally do not owe a duty to their customers to monitor their accounts. *See Tattnall Bank*, 198 S.E. at 726 (discussing how "in view of the multitudinous transactions in the ordinary daily course of banking, such institutions are not to be hampered and the conduct of their business, in which the public has a vital interest, clogged and slackened by unreasonable restrictions and overburdens."). If courts in 1938 were concerned about the potential burdens a bank may incur if forced to monitor every transfer in and out of customer accounts, the burdens in today's banking landscape are likely exponentially greater.  In the modern day, transfers from a bank account can be made in mere seconds using a banking app or website. The ACH Network alone recorded more than 30 billion transfers in 2024. *See ACH Network Volume & Value Statistics*, Nacha, https://www.nacha.org/content/ach-network-volume-and-value-statistics (last visited July 24, 2025).  To require a bank to scrutinize every single transfer from an account would be a manifestly unreasonable burden on not just banks but their customers as well.

[69] Although the Amended Complaint does not provide a date for when the Subsidiaries' accounts were opened, the Court infers that this occurred in late 2019, because that is approximately the same time that the Aliera Insiders began reorganizing Aliera's business structure and relationship with Trinity. *See* (Am. Compl. ¶¶ 81–82, ECF No. 24).

terminating Aliera's accounts in March 2020.  But these actions do not persuade the Court that Defendant plausibly engaged in a conspiracy to commit fraud against Trinity.

First, Defendant's termination of Aliera's accounts signals the opposite intention.

Next, the Amended Complaint alleges that, around the same time the Subsidiaries' accounts were opened, Trinity gained independence from Aliera and entered into new agreements with the Subsidiaries to carry out the functions Aliera was supposed to perform under the Management Agreement.  But nothing shows that Defendant either knew the function of the Subsidiaries in the context of Aliera's various frauds or whether Defendant had actual knowledge that Aliera had a continued intention to defraud Trinity through the Subsidiaries and opened those accounts as part of a plot to do so.[70]  Thus, the Court finds that merely opening accounts for Aliera pursuant to its business restructuring is not enough to show that Defendant conspired to defraud Trinity.

Although the Court could plausibly infer that Defendant knew of the fraud against Trinity, and it is plausible to infer that Defendant's provision of routine banking services substantially assisted that fraud, no allegations display that Defendant and Aliera shared a *common design*, *plan*, or *agreement* to defraud Trinity by merely failing to close or freeze the Mother Account.  And Defendant's mere

---

[70] If anything, Sharity's new-found independence combined with its agreement to deal with Aliera's Subsidiaries would indicate that Trinity and Aliera, as independent entities, either resolved or were working to resolve the claims account funding issue.

inaction—failing to close or freeze Aliera's accounts—does not suffice.   Therefore,
because the Sharity Trustee has not alleged facts to show that Defendant shared a
common design with Aliera to defraud Trinity, the Sharity Trustee has not stated a
claim for conspiracy to commit fraud.   Count VI of the Amended Complaint shall
accordingly be dismissed.

### D. The Trustees' Negligence Claims

Next, the Court analyzes whether the Trustees have stated a claim for
negligence against Defendant in Count X of the Amended Complaint.  They have not.

To state a claim for negligence, a plaintiff must allege facts demonstrating the
following elements:

> (1) a duty, or obligation, recognized by law, requiring the actor to
> conform to a certain standard of conduct, for the protection of others
> against unreasonable risks;
> (2) a failure on his part to conform to the standard required;
> (3) a reasonably close causal connection between the conduct and the
> resulting injury; and
> (4) actual loss or damage resulting to the interests of the other.

*Lilliston v. Regions Bank*, 653 S.E.2d 306, 309 (Ga. Ct. App. 2007).

The question of whether a defendant owed a duty to a plaintiff is a question of
law and the absence of a duty is fatal to a negligence claim.   *Id*.  We begin our journey
by looking at the Trustees' arguments.

First, their argument that O.C.G.A. § 7-1-490 creates a duty between a bank
and its customers is an incorrect reading of the statute, which codifies fiduciary duties
*owed by bank directors and officers* to the bank itself. *See FDIC v. Loudermilk*, 761
S.E.2d 332 (Ga. 2014) (holding that O.C.G.A. § 7-1-490 codifies that bank directors

and officers owe fiduciary duties to the bank consistent with the common law business judgment rule). Next, the allegations that Aliera and Trinity were owed a duty of care by way of the Know Your Customer rule and Anti-Money Laundering and Fraud Risk Management rules promulgated by the Bank Secrecy Act are incorrect legal conclusions as well. Courts across the country have uniformly rejected the argument that the Bank Secrecy Act's provisions create a private cause of action or a legal duty of care owed by banks to customers or third-parties; such a duty is owed only to the government. *Pub. Serv. Co. of Okla. v. A Plus, Inc.*, No. CIV-10-651-D, 2011 WL 3329181, at *8 (W.D. Okla. Aug. 2, 2011) ("Courts have repeatedly rejected negligence claims based on a bank's duty arising under the [Bank Secrecy] Act, concluding a bank's duty created by the Act is owed only to the government and not to private parties."); *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, No. 19-CV-02778-TSH, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019) (collecting cases across a multitude of jurisdictions reaching the same result). Thus, these two theories fail to establish a duty on the part of the bank.

Looking to Georgia law, there are few "duties" that a bank owes to a depositor-customer. A bank may be liable for wrongfully *dishonoring* a check or failing to pay an item. *See* O.C.G.A. §§ 11-4-402, 11-4-406(e). A bank must also provide copies of certain requested documents to its customers within a reasonable time upon request. *See* O.C.G.A. § 11-4-406(b). Antithetical to the Trustees' argument, Georgia law places a duty on a bank's *customer* to "exercise reasonable promptness in examining the [account] statement or the items [provided by the bank] to determine whether

any payment was not authorized" based on forgery, fraud, or otherwise, and to promptly notify the bank.  O.C.G.A. § 11-4-406(c).  In other words, the onus is on the depositor-customer to investigate unauthorized transactions—not the bank.

In a different context, "the Supreme Court of Georgia has held that a customer seeking a loan from a bank in order to purchase property cannot rely upon the bank to investigate or disclose any defects in the title to the property; rather, the customer is 'under the duty to prosecute his own inquiries' about the status of the title." *Lilliston*, 653 S.E.2d at 309–10 (Ga. Ct. App. 2007) (quoting *C & S Nat. Bank v. Arnold,* 240 S.E.2d 3, 4 (Ga. 1977)).  Besides the few enumerated statutory duties discussed above, the Court did not find any case law in Georgia to support the proposition that banks owe a duty of ordinary care to customers relating to account fraud perpetrated by authorized signatories.  The Trustees likewise did not cite any Georgia cases to support that position.  They cited Florida cases for such a proposition, but Florida law is not Georgia law.[71]

Georgia law is also clear that "'a bank owes no legal duty to act as a customer's legal or financial advisor.'"  *See, e.g.*, *Baxter v. Fairfield Fin. Servs., Inc.*, 704 S.E.2d

---

[71] The Trustees asserted that "a bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094-95 (11th Cir. 2017).  Not only was *Chang* decided under Florida law, but that rule does not apply in Georgia. *See GSR Markets Ltd.*, 2024 WL 3311315, at *1 (predicting that the Georgia Supreme Court would **not** follow the above-mentioned rule from *Chang*).  The fact patterns are also completely different. *Chang* involved a suit filed by a non-customer based on a bank customer's misappropriation of funds. The instant case is more analogous to a suit filed by a customer against a bank based on an authorized signatory's theft of funds.  Likewise, the Trustees cited to dicta in two Florida cases for the proposition that a bank owes a duty to a depositor "when the bank has knowledge that a particular individual ostensibly representing the depositor . . . intends to cause financial injury to the depositor." *See O'Halloran*, 350 F.3d at 1205-06; *Lamm*, 749 F.3d at 950.  However, the Trustees provide no argument, case law or reason showing that Georgia courts would adopt such a rule.

106

423, 429 (Ga. Ct. App. 2010) (quoting *First Union Nat. Bank of Georgia v. Gurley*, 431 S.E.2d 379, 381 (Ga. Ct. App. 1993). In *Lilliston*, the defendant bank failed to disclose to the car dealer plaintiff that a vehicle the dealer sought to purchase was the subject of a criminal theft investigation despite having knowledge of the same. 653 S.E.2d at 308–09. In that case, the court found that "[a]bsent a confidential relationship, no duty to disclose exists between parties engaged in arms-length business transactions." *Id.* at 309.[72] But "[t]here is no confidential relationship between a bank and its customers merely because the customer has advised with, relied upon, and trusted the bankers in the past." *Citizens & S. Nat. Bank, Augusta v. Arnold*, 240 S.E.2d 3, 4 (Ga. 1977). There are simply no allegations in the Amended Complaint showing that Aliera and Trinity were in a position where the bank exercised a controlling influence over their will, conduct, or interest. While the allegations painted Defendant as having knowingly assisted the Aliera Insiders'

---

[72] A confidential relationship is defined by "one party [being] so situated as to exercise a controlling influence over the will, conduct, and interest of another." O.C.G.A. § 23-2-58.

Fraud scheme, nothing showed that Defendant had any level of control over the Aliera Insiders, Aliera, or Trinity.[73]

---

[73] The Court notes that the Trustees cited to *Atlanta Sand & Supply Co. v. Citizens Bank*, 622 S.E.2d 484, 488 (Ga. Ct. App. 2005) for the proposition that a bank owes a legal duty of care to its depositor-customer when it has knowledge that an authorized signatory on the customer's account is misappropriating account funds. This argument is not persuasive in the context of a negligence claim.

First, the Trustees assert that the above-mentioned rule from *Atlanta Sand*, which acknowledges an exception to the general policy that a bank may assume that authorized agents on a customer's account are faithfully discharging their duties, creates a negligence per se liability on the part of Wells Fargo. However, negligence per se may only arise from statutes, ordinances, and in some instances, regulations. *See Hubbard v. Dept. of Transp.*, 568 S.E.2d 559, 566–567 (Ga. Ct. App. 2002). The rule in *Atlanta Sand* was not a statutorily-created duty but a judicially-created doctrine holding a bank liable for knowingly honoring withdrawals to a dishonest depositor, enabling that individual to steal money from accounts. *See Am. Nat. Bank of Macon v. Fid. & Deposit Co. of Md.*, 58 S.E. 867, 869 (Ga. 1907) (the seminal case establishing the judicial doctrine a bank may be liable for conversion if it knew that the authorized signatory was acting dishonestly when removing account funds). Thus, the *Atlanta Sand* exception does not support a theory of negligence per se.

The other reason that this exception is not a legal duty to support a negligence claim is because it stems from intentional tort liability, particularly as a prerequisite to holding a bank liable for embezzlement and conversion. An intentional tort claim does not give rise to a negligence claim. *See* 14 Ga. Jur. § 21:5 ("Because an intentional tort focuses on the state of mind of the defendant, there can be no such thing as a negligent intentional tort. For example, there is no such thing as negligent false imprisonment."). The *Atlanta Sand* exception appears to create a version of "aiding and abetting" liability for conversion and embezzlement, requiring that the bank have "*knowledge* of [the depositor's] breach of trust," and "*participated* in the breach of trust" by "enable[ing] the [authorized agent] to misappropriate the funds." *Id.* at 869 (emphasis added). The logical conclusion is that the *Atlanta Sand* exception does not create a duty of care for negligence liability but rather establishes that a bank may be liable for aiding and abetting an authorized signatory's misappropriation of corporate account funds.

Thus, to knowingly participate in a principal's conversion of a victim's property does not conversely create a legal duty of care to the victim to *not* participate in the conversion of their property for purposes of a negligence claim. Therefore, because (a) the *Atlanta Sand & Supply Co.* rule has never been applied to create negligence liability for a bank; (b) the rule has only been applied in the context of aiding and abetting liability for intentional torts; and (c) "there can be no such thing as a negligent intentional tort," 14 Ga. Jur. § 21:5, the Court finds that the *Atlanta Sand & Supply Co.* case and its predecessors fail to create a legal duty for negligence.

108

Simply put, while banks have some duties to their customers, these duties only extend as far as honoring checks and providing account documents within a reasonable time upon request. The Trustees have not cited any authorities establishing that a bank has a duty to its customers under federal or Georgia state law to monitor, report, or freeze bank accounts due to suspected or known fraud on those accounts by authorized signatories. Accordingly, because Georgia law does not indicate that banks owe such duties to their customers, and Trustees could not point to law creating such a duty, the Court finds as a matter of law that Trustees failed to state a claim for negligence.

### E. The Sharity Trustee's Georgia RICO Claim

Next, the Court shall review Count IX of the Amended Complaint, wherein the Sharity Trustee alleges that Defendant violated, or in the alternative, conspired to violate Georgia RICO. Upon review of the Amended Complaint, the Court finds that the Sharity Trustee has not stated a claim upon which relief can be granted under either of these theories.

---

The Court has found no cases establishing the *Atlanta Sand* exception as a basis for negligence liability. Rather, it appears to have only been discussed as a basis for bank liability for the intentional torts of conversion and embezzlement. *See, e.g., Nat'l Factor & Inv. Corp. v. State Bank of Cochran*, 163 S.E.2d 817, 820 (Ga. 1968); *Am. Nat. Bank of Macon v. Fid. & Deposit Co. of Md.*, 58 S.E. 867, 869 (Ga. 1907); *Bank S. v. Grand Lodge of Free & Accepted Masons for Georgia*, 331 S.E.2d 629, 633 (Ga. Ct. App. 1985); *Flo-Control, Inc. v. Ne. Bank*, 258 S.E.2d 695, 695 (Ga. Ct. App. 1979). The Trustees have not brought a claim for conversion nor embezzlement. Likewise, the Court has not assessed the Amended Complaint for such claims and is not implying that the Trustees could plausibly plead such claims. If the Trustees sought to amend the pleadings to include these types of claims, the Defendant would be entitled to respond. The Court does note that it has not been able to find any published cases where courts have held that the *Atlanta Sand* exception applied favorably to a plaintiff. The only case that comes close was decided more than a century ago and involved a bank that failed to follow a court order to only honor a check from a receivership entity's account if such check is signed by the judge. *Am. Nat. Bank of Macon*, 58 S.E. at 869. However, the Georgia Supreme Court ultimately decided the case in favor of the defendant bank on statute of limitations grounds. *Id*. at 870.

Despite being a criminal statute, the Georgia RICO Act is also available as a civil remedy. *See Benevolent Lodge No. 3 v. Davis*, 878 S.E.2d 760, 764 (Ga. Ct. App. 2022). Georgia employs three flavors of RICO liability.  First, a defendant can violate Georgia RICO by participating in a pattern of racketeering activity as a member of traditional criminal enterprise.  *See* O.C.G.A. § 16-14-4(b).  Second, a defendant can violate Georgia RICO by acquiring money through his commission of a pattern of criminal activity.  *See* O.C.G.A. § 16-14-4(a).  Finally, a defendant can be held liable for entering a conspiracy to violate Georgia RICO.  O.C.G.A. § 16-14-4(c).  Each of these theories fail for a variety of reasons addressed below.

Because the Sharity Trustee's Georgia RICO allegations allege insurance fraud as the underlying predicate act, the Court shall review this count under the heightened pleading standard required by Fed. R. Civ. P. 9(b). *See Durham*, 847 F.2d 1505, 1511 (11th Cir. 1988) (applying Rule 9(b)'s heightened pleading standard to a federal RICO claim because it was based on a predicate act of wire fraud).

### 1.  Lack of Racketeering Activity

To be liable for Georgia RICO, the defendant must have "conduct[ed] or participate[d] in, directly or indirectly, [the alleged] enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b). A "racketeering activity," also known as a "predicate act," is the commission of, the attempt to commit, or the solicitation or coercing of another to commit a "crime which is chargeable by indictment" under one of forty-one categories of offenses. O.C.G.A. § 16-14-3(9)(A)(i)–(xli); *see also Wylie v. Denton*, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013) (same). A "pattern of racketeering

110

activity" may be established by showing that the same predicate offense was committed at least twice. *See Benevolent Lodge No. 3*, 878 S.E.2d at 765; *see also Ali v. State*, 761 S.E.2d 601, 605 (Ga. Ct. App. 2014) (finding a pattern of racketeering activity where the defendants "committed the [same underlying] predicate offenses—trafficking in contraband cigarettes—multiple times.").

The Sharity Trustee alleges that Defendant committed a pattern of racketeering activity by either committing a pattern of insurance fraud or conspiring with Aliera's Insiders to violate Georgia RICO by way of insurance fraud.  O.C.G.A. § 16-14-3(5)(C), 33-1-9.

First, Georgia's insurance fraud laws provide that under O.C.G.A. § 33-1-9, the party committing said fraud must have been a "natural person." S*ee* O.C.G.A. § 33-1-2 (defining "[n]atural person" as being "an individual human being" and not an entity).  Because Defendant is an entity, it could not have violated O.C.G.A. § 33-1-9,

Georgia's insurance fraud statute.  The Sharity Trustee has not met its burden to overcome Defendant's assertion.[74]

Based on this, the Court finds that the Georgia RICO claim fails under O.C.G.A. § 16-14-4(a) and § 16-14-4(b), which requires a showing that the defendant itself committed a pattern of racketeering activity.  But that is not the only reason the Georgia RICO count fails.  We turn now to the other reason: failure to allege an enterprise.

## 2.  Lack of Enterprise

Under the "traditional" approach to Georgia RICO, a defendant may be liable if he is "employed by or associated with" an enterprise and engages in "a pattern of racketeering activity" to further the enterprise.  O.C.G.A. § 16-14-4(b).  An "[e]nterprise" is defined as

> [A]ny person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated

---

[74] Also worth noting is that the Sharity Trustee's Amended Complaint does not elaborate as to how the Defendant engaged in a racketeering activity, whether by insurance fraud or otherwise. Rule 9(b) requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  Georgia's insurance fraud statute is a lengthy statute with 19 separately enumerated offenses within it.  *See* O.C.G.A. § 33-1-9(a)–(c).  To vaguely state that Defendant has committed insurance fraud without being able to point to a specific provision in the statute is not acceptable to the Court. How can Defendant be reasonably apprised of his alleged fraud if the Sharity Trustee cannot specifically identify the statutory provision or provisions that he claims to have been violated?  The Response to the Motion is no better.  In that, the Sharity Trustee skirts around his deficient pleading of insurance fraud by arguing that "insurance fraud is not the only form of fraud present in the [Aliera] Insiders' scheme," before arguing that Defendant committed mail and wire fraud—racketeering activities that are not mentioned in the Amended Complaint whatsoever.  *See* (Response at 21, ECF No. 32).

By contrast, in *Health Reform Team* there were well-pleaded facts showing that the broker defendant actually knowingly and intentionally sold fraudulent insurance plans, including specific examples of fraudulent representations made to Consumer Members for exorbitant commissions.  *See Health Reform Team*, 665 B.R. at 520.  Nothing of this nature is alleged here.  The Court has seen no allegations nor argument that specifies how Defendants committed insurance, wire or mail fraud.

in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities.

O.C.G.A. § 16-14-3(3).

More to the point, to plead the existence of a RICO enterprise, the plaintiff must "allege that a group of persons shares three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (internal quotations and citation omitted).[75] "[T]hese requirements make pleading an association-in-fact enterprise 'more challenging.'" *Cisneros*, 972 F.3d at 1211 (quoting *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017). The second prong has been met, as the parties were clearly alleged to have had a working relationship. The third prong is somewhat dependent upon the first, but in any event the parties had worked together for approximately four years, which would be more than enough time to accomplish two or more predicate acts under RICO. However, the Sharity Trustee has not sufficiently established the purpose prong for the reasons discussed below.

To demonstrate the purpose prong of an enterprise, the plaintiff must show that the alleged participants of the enterprise had "'a common purpose of engaging in a course of conduct.'" *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Where the alleged enterprise's participants' "ultimate purpose is to make money for

---

[75] "'Because the Georgia RICO Act was modeled after the federal statute, [Georgia courts have] found federal authority persuasive in interpreting the Georgia RICO statute[.]'" *Aquino v. Mobis Alabama, LLC*, 739 F. Supp. 3d 1152, 1223 (N.D. Ga. 2024) (Batten, C.J.) (quoting *Williams Gen. Corp. v. Stone*, 614 S.E.2d 758, 760 (Ga. 2005) (citations omitted)).

themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *Id*.

Here, the Sharity Trustee has "alleged no facts that plausibly support the inference that [Defendant was trying to make money with the Aliera Insiders] <u>by fraud</u>, which is a common purpose sufficient to find a RICO enterprise." *Id*. at 1212 (emphasis in original).  As the Court discussed above, Defendant began its relationship with the Aliera Insiders and Aliera, the ringleaders of the alleged enterprise, prior to plausibly acquiring knowledge of Aliera and the Aliera Insiders' fraudulent scheme.  In other words, Defendant entered its relationship with Aliera and the Aliera Insiders to make money by providing typical banking services for its customary fees but was not alleged to have the common purpose of committing fraud. The allegations allow for a plausible inference that Defendant provided substantial assistance to Aliera's scheme after acquiring knowledge of the scheme as early as December 2018, after learning that Aliera did not fund Trinity's accounts, which were opened three months prior.

However, the Amended Complaint does not show that Defendant's purpose in providing these services was to enrich itself by fraud or other criminal means. Instead, Defendant provided essentially the same banking services to Aliera, Trinity, and the Aliera Insiders' other entities irrespective of whether Defendant knew of the Aliera Insiders' scheme.  In other words, Defendant's purpose was to enrich itself but not "through a particular criminal course of conduct." *Id*. at 1211.  Rather, Defendant was content to provide customary banking services at its customary rates to Aliera

114

and the Aliera Insiders **regardless** of whether their business was illegal or not.  This kind of "abstract common purpose, . . . [namely the participants'] generally shared interest in making money[] will not suffice" to establish the purpose prong of RICO's enterprise requirement.  *Id.*  Defendant's purpose was to profit through its customary services it provides to all of its customers,[76] whereas the Aliera Insiders' purpose was to profit through the sale of an illegal health insurance product to the public and abscond with those monies.

Contrast this with *Health Reform Team*, *Inc.*, where the Sharity Trustee alleged that the broker-defendant shared a common purpose to enrich itself through wire fraud based on the defendant's knowledge that it was receiving an allegedly well-above-market commission for HCSM plan sales of an illegal product, a mutual understanding that the Aliera Insiders and Defendant were going to take funds that should have been allocated for Aliera and Trinity's liabilities, and make misrepresentations that the Aliera Insiders and Aliera instructed  defendant to make to Consumer Members.  665 B.R. at 487–88.  That case permitted a plausible inference that the alleged enterprise participants shared a common purpose to enrich themselves *by wire fraud*, because that was allegedly what led the parties to work with each other in the first place.  That is not what the allegations before the Court show in the instant case.

---

[76] Also worth noting is that a "routine contractual combination," particularly where "a bank provided banking services" "is not generally sufficient to constitute a RICO enterprise."  *Parm v. Nat'l Bank of California, N.A.*, 242 F. Supp. 3d 1321, 1347 (N.D. Ga. 2017).  Thus, the Sharity Trustee's "allegations, while creative, essentially attempt to recase a contractual relationship as a RICO enterprise."  *Id.* at 1348.  However, "[t]he consensus among courts reflects the judgment that the statutory requirements of RICO cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise." *Id.* (internal quotations and citation omitted).

Thus, because the Amended Complaint fails to show that Defendant shared a common purpose with the Aliera Insiders and Aliera to make money by a particular criminal course of conduct, the purpose prong of the RICO enterprise requirement has not been met. Defendant was only alleged to have sought to make money *in general* from Aliera, regardless of whether Aliera and the Aliera Insiders' business or conduct was legal or illegal.[77] Without a particular criminal purpose, Defendant cannot have been part of enterprise under the RICO statute.

Accordingly, the Sharity Trustee does not state a claim under Georgia RICO because he has not alleged that Defendant engaged in a racketeering activity nor that Defendant shared a common purpose with Aliera and the Aliera Insiders sufficient to create an enterprise. As such, the Sharity Trustee has not stated a claim for Georgia RICO under O.C.G.A. § 16-14-4(b) for both of the reasons discussed above.

### 3. Lack of Conspiracy

Finally, in addition to the reasons discussed above, the Sharity Trustee's conspiracy to violate Georgia RICO claim fails because of failure to plead a conspiracy. A defendant may be liable for Georgia RICO where he has not "personally committed [an] underlying predicate offense," but he still must have entered a

---

[77] Even the conclusory allegations in the Amended Complaint reiterate the Court's view: "Defendant's actions [of providing certain banking services to the Aliera Insiders] were committed for financial gain[.]" (Am. Compl. ¶ 177, ECF No. 24). Despite being a conclusory allegation, the Court agrees that this is the most favorable, plausible inference that the Amended Complaint affords the Sharity Trustee with respect to the enterprise issue. The Defendant was only alleged to have had the "abstract common purpose" of making money more generally. *See Cisneros*, 972 F.3d at 1211. No allegations show that, subsequent to obtaining knowledge of the HCSM fraud scheme, Defendant sought "to make money by [mail, wire, or insurance] fraud," "as opposed to the 'obvious alternative explanation[]' . . . that [Defendant was] simply trying to make money" by providing banking services to a lucrative customer in general, regardless of its depositor-customer's business model. *Id.* at 1212 (emphasis omitted).

116

conspiracy to violate Georgia RICO. *Pasha v. State*, 616 S.E.2d 135, 138 (Ga. Ct. App. 2005). However, as the Court discussed above, Defendant's mere failure to close or freeze Aliera's accounts after learning about the fraud against Trinity in December of 2018 does not suffice to create a plausible inference of a conspiracy. Defendant's only other alleged actions after that point were to reopen the Trinity account in 2019 following a deposit, to open the Subsidiaries' accounts in late 2019, and to terminate Aliera's accounts in March of 2020. But again, those allegations do not show that Defendant entered a common design with Aliera and the Aliera Insiders to commit multiple acts of insurance, wire, or mail fraud to harm Sharity.

Therefore, the Sharity Trustee's conspiracy to violate Georgia RICO claim under O.C.G.A. § 16-14-4(c) fails for lack of an adequately alleged conspiracy.

### F. The Sharity Trustee's Contribution Claim

Next, the Court shall address the Sharity Trustee's Count XI claim for contribution. The Sharity Trustee alleges that Defendant must pay its pro rata share

of the Sharity estate's more than \$360,000,000 fixed liability to Consumer Members.[78]  The Court disagrees.

First, Georgia's law of contribution provides that "where a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly." O.C.G.A. § 51-12-32(a).  Moral turpitude "has been defined as 'everything done contrary to justice, honesty, modesty, or good morals.'" *Crawford v. Johnson*, 489 S.E.2d 552, 555 (Ga. Ct. App. 1997) (quoting *Huff v. Anderson*, 90 S.E.2d 329, 331 (Ga. 1955)).  Georgia courts have broadly categorized acts involving moral turpitude to encompass intentional torts more broadly.  See *id.* ("[T]o the extent Crawford's liability to Presbyterian was grounded in actual fraud, conversion, or other acts of moral turpitude, he has no claim for contribution.  The record shows, however, that the jury was not charged solely on such intentional acts."); *see also Maxwell Bros. of Athens, Inc. v. Deupree Co.*, 199 S.E.2d 403, 404–06 (Ga. Ct. App. 1973) (emphasizing that contribution applies to

---

[78] The Sharity Trustee cites the Class 4 Allowed General Unsecured Claims in the Sharity Plan as his basis for the contribution claim, arguing that an allowed claim is the functional equivalent of a judgment.  These allowed claims are held by Consumer Members, who were each determined to have an allowed claim against Sharity for "the greater of (i) the amount of any uncovered medical expenses regardless of whether those medical expenses were approved or denied by Sharity or (ii) a return of all payments made to the Debtor." [Sharity Docket No. 343-1].  Although an allowed claim may be considered the functional equivalent of a judgment for res judicata purposes, *see, e.g.*, *Ruth v. LVNV Funding, Inc. (In re Ruth)*, 473 B.R. 152, 162 (Bankr. S.D. Tex. 2012) (case cited by the Sharity Trustee dealing with whether an allowed claim is the equivalent of a judgment for res judicata purposes), that argument does not apply in the context of a contribution claim.  As the Eleventh Circuit has recognized, "[a]n allowed claim in bankruptcy serves a different objective from that of a money judgment—it permits the claimant to participate in the distribution of the bankruptcy estate. . . . 'The assertion of a claim in bankruptcy is, of course, not an attempt to recover a judgment against the debtor but to obtain a distributive share in the immediate assets of the proceeding.'" *Ziino v. Baker*, 613 F.3d 1326, 1328 (11th Cir. 2010) (holding that a creditor's allowed claim based on a promissory note did **not** function as a money judgment giving the creditor the right to levy on assets of the debtor).

"unintentional joint tortfeasors" and that "contribution among joint tortfeasors must originate in the first instance on the interconnection of acts of negligence on the part of each resulting in damage to the [victim]."). The Eleventh Circuit agrees. *Greyhound Lines, Inc. v. Cobb Cnty., Ga.*, 681 F.2d 1327, 1333 (11th Cir. 1982) (analyzing Georgia law to determine that a right of contribution is not available where the joint tortfeasors engaged in intentional torts). Thus, Defendant may only be subject to contribution where the joint tortfeasors' actions were *unintentional*. The only unintentional tort argued as a basis of Defendant's liability was negligence in Count X of the Amended Complaint. That claim was dismissed for the reasons stated above.

However, even if the Sharity Trustee could state a claim for negligence based on a duty owed to Trinity,[79] it still would not be enough. The basis of contribution is that the joint tortfeasors must share a common, unintentional tort liability to the alleged victim—in this case, the Consumer Members. *State Auto Mut. Ins. Co. v. Relocation & Corp. Hous. Servs., Inc.*, 651 S.E.2d 829, 832 (Ga. Ct. App. 2007) ("The right to contribution relates only to joint tortfeasors, and where the proposed defendant cannot be made liable as a joint tortfeasor, the contribution action does not state a claim."); *see also Thyssen Elevator Co. v. Drayton-Bryan Co.*, 106 F. Supp. 2d 1342, 1346, 1346 n.3 (S.D. Ga. 2000) ("A prerequisite for contribution is that the party seeking contribution and the party from whom it is sought must share a common liability.'"). But under Georgia law "a bank does not owe a duty of care to a

---

[79] Recall that the Sharity Trustee only has standing to bring claims based on direct harm to Sharity or indirect, general harm to *all* of Sharity's creditors.

noncustomer with whom the bank has no direct relationship." *GSR Markets Ltd.*, 2024 WL 3311315, at *1. This rule applies even where the "bank knows or should have known that a fiduciary relationship exists between a customer and noncustomer, and it has actual knowledge of its customer's misappropriation of funds." *Id.* Therefore, because Defendant did not owe a duty of care to the Consumer Members, a group that was not alleged to be Wells Fargo account holder-customers, Defendant could not have been a joint tortfeasor for contribution purposes based on negligence liability. Accordingly, the Sharity Trustee cannot state a claim for contribution based on negligence.

No other joint, several, or joint and several torts have been identified by the Sharity Trustee as giving rise to a contribution claim. And this Court need not lead itself on a directionless inquiry into exactly what tort Defendant may or may not have violated to give rise to the contribution claim.[80] Thus, the Court finds that the Sharity Trustee has failed to state a claim for contribution. Count XI shall be dismissed.

### G. The Trustees' Attorney Fees and Costs and Punitive Damages Claims

Finally, the Court addresses whether the Trustees' claims for punitive damages and attorney fees and costs survive.

"An award of attorney fees, costs, or punitive damages is derivative of a plaintiff's substantive claims." *Stephen A. Wheat Tr. v. Sparks*, 754 S.E.2d 640, 648

---

[80] *See Jones v. Pilgrim's Pride, Inc.*, 741 F. Supp. 2d 1272, 1275 (N.D. Ala. 2010) ("Courts are not obligated to read a party's mind or to construct arguments that it has failed to raise and that are not reasonably presented in the court file." (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) ("There is no burden upon the [trial] court to distill every potential argument that could be made based upon the materials before it ....")))

(Ga. Ct. App. 2014). Therefore, in accordance with this principle, because each of the Aliera Trustee's causes of action have been dismissed for failure to state a claim, so too must the Aliera Trustee's prayer for attorney fees, costs, and punitive damages under Counts XII and XIII of the Amended Complaint.

However, the same cannot be said of the Sharity Trustee who has stated a claim for fraud. First, "where a plaintiff has set forth a valid claim for an intentional tort, such as fraud, he may be entitled to recover the expenses of litigation, including attorney fees [and costs]." *Id.* In addition, the Sharity Trustee's claim for punitive damages likewise survives the Motion. Punitive damages are available as a remedy in "tort actions" where the plaintiff can show that the defendant acted with "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b).

> [W]anton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent. Conscious indifference to consequences involves an intentional disregard of the rights of another, knowingly or willfully disregarding those rights.

*Wardlaw v. Ivey*, 676 S.E.2d 858, 861 (Ga. Ct. App. 2009). "Fraud is an intentional tort for which punitive damages may be awarded." *Stephen A. Wheat Tr.*, 754 S.E.2d at 648.

Based on the Sharity Trustee's allegations, the Court finds that Defendant's alleged knowing and substantial assistance to the Aliera Insiders' fraud against Trinity creates a plausible inference that Defendant acted with "intentional disregard of the rights of [Trinity], knowingly or willfully disregarding those rights." *Id.*

Accordingly, unlike his co-plaintiff, the Sharity Trustee has stated claims under Counts XII and XIII respectively.

## CONCLUSION

After considering the Amended Complaint, the arguments of the parties and matters of public record in the bankruptcy case, the Court finds that the Amended Complaint must be dismissed with respect to the Aliera Trustee because it has not stated a claim under any Counts in the pleadings.  In addition, because the Sharity Trustee has stated a claim only for Counts V, XII and XIII of the Amended Complaint, the remainder of his claims shall be dismissed. [81]  Accordingly, it is hereby

**ORDERED** that Defendant's Motion is **granted** against the Aliera Trustee with respect to each of the Counts in the Amended Complaint (Counts I–XIII) such that those claims shall be dismissed; and it is

**FURTHER ORDERED** that Defendant's Motion is **granted** against the Sharity Trustee with respect to Counts VI, VII, VIII, IX, X and XI of the Amended

---

[81] The Sharity Trust Agreement was ratified by the Bankruptcy Court on December 2, 2021, [Sharity Docket No. 343], the Order for Relief and appointment of an Unsecured Creditors' Committee in the Aliera case were entered in February 2022, [Aliera Docket Nos. 80, 91], and the Aliera Trust Agreement was ratified by the Bankruptcy Court on August 17, 2023, [Aliera Docket No. 576].  This adversary case was filed on December 21, 2023.  That means the Aliera Unsecured Creditors' Committee (and then the Aliera Trustee) and Sharity Trustee had about two years to conduct due diligence and discovery before filing the original or Amended Complaint, such as an examination under Fed. R. Bankr. P. 2004, which would have allowed a broad examination of Defendant (and the other banks) with respect to its relationship with Aliera and Sharity, but the Amended Complaint still lacks well pled, substantive allegations against Defendant.  The Plaintiffs had the burden of pleading plausible allegations in the Amended Complaint, not merely conclusory allegations that could be plausible after more discovery.  The purpose of discovery is to develop evidence to prove or disprove a plausible claim, not to retroactively rectify an insufficient pleading.  The Aliera Trustee did not satisfy its pleading burden, even at this stage; and the Sharity Trustee has met his burden for only one out of ten of his substantive claims.

Complaint such that those claims shall be dismissed, but the Motion is **denied** with respect to Counts V, XII, and XIII.

The Clerk is directed to serve a copy of this Order on the respective Counsel for Plaintiffs and Defendant.

**END OF ORDER**